# Greek Catholic Church *v.* Orthodox Greek Church.

*Church law—Form of worship—Trust—Implied contract—Greek Catholic Church—Orthodox Greek Catholic Russian Church.*

When a house is created for religious worship and it cannot be discovered what was the nature of the worship intended by it, it must be implied from the usage of the congregation, and it is the duty of the court to administer the trust in such manner as best to establish the usage, considering it a matter of implied contract with the congregation.

In a contest over the possession of a church building which had been given in trust to the congregation, it is the duty of the court to decide in favor of those, whether a minority or majority of the congregation who are adhering to the doctrine professed by the congregation and the form of the worship in practice, as also in favor of the government of the

church in operation with which it was connected at the time the trust was declared.

In accordance with the request of a number of persons of Slavonic birth, who desired a place of worship, another person of Slavonic birth bought a lot, taking title in his own name as trustee to secure the money which he had paid out for the purchase of the lot. A church was erected on it, and subsequently the representative of the original purchaser conveyed the land to two persons as trustees of the Greek Catholic Church of Wilkes-Barre. At the time of the creation of the trust there were two separate and distinct religious organizations existing among the Slavonic people. One was known as the United Greek Catholic Church, which recognizes the religious supremacy of the pope and the second was known as the Orthodox Greek Catholic Russian Church, which recognized the religious supremacy of the czar. The first two pastors of the church at Wilkes-Barre were members of the United Greek Catholic Church, and conducted the services in accordance with the rules of that organization. The third pastor was when he was installed, a member of the United Greek Catholic Church, but subsequently he and the trustees renounced that organization and filed a petition in the court of common pleas with certain members of the congregation, praying that the church property should be conveyed to the petitioners, and to the bishop of the Orthodox Greek Catholic Russian Church, having jurisdiction over the United States. The prayer of this petition was granted. The evidence showed that a very large proportion of the members of the Wilkes-Barre church at the time of the creation of the trust were members of the United Greek Catholic Church acknowledging the supremacy of the pope. A bill in equity was filed by the adherents of the United Greek Catholic Church to restrain the adherents of the Orthodox Greek Catholic Russian Church from continuing in possession of the church and from interfering in the conduct of the service. *Held* that the bill should be sustained.

Argued April 9, 1900. Appeal, No. 311, Jan. T., 1899, by defendants, from decree of C. P. Luzerne Co., May T., 1894, No. 2, on bill in equity in case of the Greek Catholic Church of Wilkes-Barre v. The Orthodox Greek Catholic Church. Before GREEN, C. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an injunction.

The facts appear by the opinion of DUNHAM, P. J., specially presiding, which was as follows:

For some years prior to 1887 there had been considerable emigration from Austria and the central portion of Europe to

the coal fields of the United States. Quite a number of these immigrants settled in Wyoming valley in and around Wilkes-Barre, Kingston and other places where coal mining operations were being carried on. These immigrants who came from Hungary, Galicia and the western portions of Russia, that settled in and around Wilkes-Barre, naturally brought with them the desire to have some place of worship established where they might attend and worship God, according to the forms and manners that they had been accustomed to in their native countries. While all these people did not speak the same language or at least the same dialect, yet there was such a similarity in their various dialects, that most of them could understand each other; all or nearly all speaking the Slavonic language, though of course in different dialect according to the region from which they might come.

These people had been accustomed to attend church and undoubtedly were members of such churches in there native country, where the mass and all the services in the church were conducted in the language familiar to them. These services were very much like those of the Roman Catholic Church except that in the Roman Catholic Church a considerable portion of the services is conducted in the Latin language.

It was quite natural that these people should desire a church established where the services should be conducted in a language understood by them, and, in fact one like in all respects to those they had been in the habit of attending. Under these conditions and circumstances we naturally would expect to find these members of the Slavonic race combining together to build a church and procure a pastor therefor, where they might attend and worship God according to manner and in the way they had been accustomed to, and it is virtually admitted by all parties to this controversy that this is exactly what took place, the real controversy being as to what church or form of religion they had been accustomed to, or at least as to what church or denomination they intended and supposed they established. There being many things in this case that are admitted by both parties to the controversy, it will probably be better to state first those matters that are not in dispute, and upon which all are agreed; so having these facts to start upon it will probably be easier to ascertain the facts as to those matters about which there is a controversy.

There is no question but what John Kosek, a member as we understand of the Slavonic race, residing in Wilkes-Barre, who had resided there for some time and been in business, dealing with members of that race, understanding their language and having the confidence of the Slavs generally, was requested by a very large number of these people to procure for them a church, where they might meet and hold religious services according to the forms and in the manner they had been used to holding them in the old country; that in pursuance of said request to him, John Kosek did on August 31, 1887, enter into articles of agreement to purchase two lots of ground in Wilkes-Barre for the purpose of having a church and parsonage for these people, and upon August 28, 1889, received two deeds for the same in his own name as trustee without expressing in any manner for whom or for what purpose he was trustee; that upon these two lots while it was held by John Kosek, either under the articles of agreement or under the deed to him as trustee, there were erected a church building and a house or residence for the priest or pastor; that John Kosek died intestate some time in February, 1890, having a title to these two lots in him as "trustee;" that John Kosek and his estate were reimbursed for the money advanced by him in the purchase of these lots and in aid of the construction of the church and parsonage by money raised by subscription principally among the members and congregation of the church so built and established and contributed for the purpose of building the church and parsonage and procuring title to the same and the lots upon which they were built; that upon petition to the court of common pleas of Luzerne county, Elizabeth Kosek, widow of John Kosek, deceased, was appointed trustee in place of John Kosek, deceased, and upon May 8, 1890, she as said trustee, conveyed the two lots upon which the church and parsonage were situated to "Michael Jevcsak, Michael Pevowarnick and Arthur Pevowarnick, trustees, in trust for the use and benefit of the Greek Catholic Church of Wilkes-Barre, Pennsylvania;" that upon the completion of the church and parsonage the congregation or some one for or on behalf of them, sent to Hungary and obtained a pastor who took charge of the church and parish and remained as the priest or pastor for a period of about two years; that upon this pastor's leaving, whose name was

Rev. Alexander Dzuby, he was succeeded by Rev. Nicholas Stetsovitch, who remained in charge for a period of about ten months, and that then the congregation was without a pastor for some months, or until some time in December, 1892, or January, 1893, when Rev. Alexis Toth took charge of the church and congregation as pastor, who has continued as pastor up to the present time; that since Rev. Toth became the pastor of the church, a petition was presented to the court of common pleas of Luzerne county to No. 964, October term, 1893, setting forth, " that the petitioners are trustees for the Greek Catholic Church of Wilkes-Barre, Pennsylvania, and held as such trustees, certain church lots in Wilkes-Barre, Pennsylvania, and that it is the wish and desire of the congregation known as the Greek Catholic Church of Wilkes-Barre, Pennsylvania, to have the lots conveyed to the petitioners and to the Right Rev. Nicholas, Bishop of the Aleutian Islands and Alaska, with jurisdiction over the United States, of San Francisco, California, as trustees for the St. Mary's Russian Greek Orthodox Catholic Church of Wilkes-Barre, Pennsylvania," which is the proper name of said Greek Catholic Church of Wilkes-Barre, Pennsylvania, and praying for a decree accordingly.

On September 18, 1893, the court did make a decree in accordance with the requests in the above mentioned petition. It is undisputed and practically admitted by the defendants, that Rev. Dzuby and Rev. Stetsovitch who were priests or pastors of this church during the first three years of its existence, belonged to the United Greek Catholic Church, which acknowledged the pope as the spiritual head of the church upon earth.

It is also unquestioned that when Rev. Alexis Toth came to America and first held service in this church for Rev. Dzuby, he was also a member of the United Greek Catholic Church and acknowledged the pope as the earthly head of the church or the head of the church upon earth.

It is also undisputed that before Rev. Toth became pastor of the church and prior to the acceptance of this congregation and church under the jurisdiction of the Bishop Nicholas, Bishop of the Aleutian Islands and Alaska, with jurisdiction over the United States, and before the decree of the court making Bishop Nicholas one of the trustees, the Rev. Toth and Bishop Nicholas required trustees of the church property and the officers

of the societies of St. Peter and Rome and St. John the Baptist, to sign a renunciation of their belief or connection with the "United Greek Catholic Church," of which the following is an extract:

"We, the undersigned, trustees of the Annunciation Church, and inhabitants of the City of Wilkes-Barre, State of Pennsylvania, and also we, the officers of the following societies, viz, St. Peter and Paul, St. Nicholas and St. John the Baptist of the same church and city, humbly beseech your eminency that you kindly accept us and our church in your protection and your spiritual jurisdiction, and thereupon we, as Uniates with this writ declare:

"1. That we renounce the United Church and religion and that we wish to return to the same church and religion to which church our ancestors belonged, and to the very church of our Lord Jesus Christ, such as the Orthodox Greek Catholic Russian Church.

"2. That we reject all new inventions of the Roman and United Church, such as the primacy of the pope and his infallibility, and the doctrine of Purgatory and the Immaculate Conception of the Blessed Virgin and all the errors which are cast away by the only one Holy Catholic and Apostolic Church. Further we confess the creed of Nicea Constantinople, without any heretical additions 'and son' (doctrine of Holy Ghost); also we confess that only what our Saviour, Jesus Christ, his Saint Apostles and the Saint Fathers of the church and the seven Universal Councils taught, which doctrine is taught only by the Holy Orthodox Greek Catholic Russian Church at present time, from which church our ancestors, not by their own fault, but through severe persecution, were compelled to abandon. Therefore we return to our Very and Holy Mother, the Orthodox Greek Catholic Russian Church, and thus subject ourselves spiritually to your Eminency and Holy Synod of Russia.   We beg and desire from our hearts that you mercifully accept (us) in your Orthodox Greek Catholic Church.

"3. We hereby grant and deliver to the jurisdiction of your Eminency, our church property, parsonage; . . . . also all documents in relation with the said church to the amount of ten thousand dollars, and the keys of the said church."

The foregoing was not only signed by the trustees and offi-

cers, of said societies, but also by those persons who were to be taken into the Orthodox Greek Catholic Russian Church. It is also undisputed and acknowledged by all parties to this controversy that the United Greek Catholic Church is an organization separate and distinct from the Orthodox Greek Catholic Russian Church, and that its doctrines, tenets, rules, etc., are the same as the Roman Catholic Church, except in some matters of discipline, both acknowledging the pope as the ecclesiastical head of the church and acknowledging the authority of the bishops appointed by him. While the Orthodox Greek Catholic Russian Church differs in many respects in its faith, doctrines, tenets, rules, etc., from the United Greek Catholic Church, and acknowledges as its spiritual or ecclesiastical head "the Synod of Russia, consisting of bishops appointed by the czar of Russia."

That these two separate and distinct churches have existed and had these marked differences in their beliefs and government for a long period of time.

Practically the foregoing are undisputed facts from which we must now pass to consider evidence offered by both parties as bearing upon these facts, in order that we can arrive at a proper and just conclusion as to what ought to be done to deal out equity and justice to the parties to this controversy.

There has been a very great amount of evidence given by a large number of witnesses on the part of the defendant to show that the actual belief and religious convictions of these witnesses are and always have been in accordance with the faith, belief and practice of the Orthodox Greek Catholic Russian Church. A large majority of these witnesses have testified that the teachings of Rev. Toth and the conduct of the services by him, are exactly the same as those of Revs. Dzuby and Stetsovitch, and the same as those of the priests where they attended in the old country. These witnesses as well as most of the congregation called by the plaintiffs, have shown very great ignorance in regard to what they really believe or as to what is the difference between these two warring churches in matters of faith or teachings, and we are compelled to feel that they have shown so little knowledge of the matters they testify to, as to entitle their testimony upon these points to very little weight upon matters of church doctrine or belief or as to the forms of service.

Again much evidence has been given in the way of church history and from the writing of learned, able and competent men as to the conflicts between the Greek Church proper and the Roman Catholic Church, and also as to the history of the United Greek Church and of the countries where these United churches are located, and it has been most ably contended by counsel for the defendants that these members of the United churches are kept in ignorance of the fact that the church acknowledges the pope as its ecclesiastical head, and adheres to all the dogmas of the Roman Catholic Church, and that they, the lay members, suppose they belong to the Orthodox Greek Catholic Russian Church. It would be exceedingly interesting as a historical question, to go into this church history and attempt to trace the history of these churches from the earliest period down to the present, and to ascertain the real facts as to the schisms and controversies, but we do not feel that it could throw any light upon, or in any way assist in deciding the present controversy. It is enough for us to know that at the time this church was begun there was a "United Greek Catholic Church," having regular creeds, organizations and all that pertains to any denomination of Christians, and that there was also at the same time, an Orthodox Greek Catholic Russian Church in same condition as to creeds, etc.

It is a matter of no consequence as we view the case, as to when, how, or under what circumstances these denominations were organized, and we certainly have no more desire than we have the legal right to attempt to interfere and decide or even intimate which is in the right or which is the older or in any way express an opinion upon these rival organizations.

From the evidence of Rt. Rev. Bishop O'Hara, Rt. Rev. Bishop Hoban and the clergymen called, who testify intelligently and understandingly, it is very evident, as well as by a careful reading of the petition of the trustees, officers of the societies of St. Peter and St. Paul and St. Nicholas and St. John the Baptist, and members of the congregation of this church, that the churches to which a very large proportion of the congregation belonged before coming from Hungary and Galicia were United Greek Catholic churches and that this church prior to the time Rev. Toth took charge of it, was presided over by a United Greek Catholic priest and was to all intents and purposes, a United Greek Catholic Church.

Counsel for the defendants have argued most ably and eloquently that we ought to respect the religious beliefs and opinions of the members of the church organization as to their beliefs, and as to which church they belong and are in harmony with.

We feel, however, that church members who cannot see any difference in the services, mass, etc., as conducted by Rev. Toth, a member of the Orthodox Greek Catholic Russian Church and in his teachings of doctrines, and the services and teachings of doctrines of Revs. Dzuby and Stetsovitch and the priests in Galicia and Hungary who were United Greek Catholics and acknowledged the pope as the head of the church on earth, are not very liable to have their religious sentiments or beliefs greatly outraged by attending church under priests of the United Greek Catholic religion.

Then, too, so far as we are concerned, who are unable to read the thoughts and workings of the mind, we know of no way of ascertaining the sentiments, beliefs and religion of any set of men or any congregation, except by finding to what church they belong and to what confession of faith they give their adherence, and then by articles of faith and belief and by the discipline or other constitution of such church, ascertain to what church they properly belong and what is their authorized belief.

The deed from Elizabeth Kosek, trustee to Mike Jevcsak, Andrew Pevowarnick and Michael Pevowarnick is to them as trustees of the Greek Catholic Church of Wilkes-Barre, Pa., and successors. Under this deed these men might be trustees of the United Greek Catholic Church or they might be trustees of the Orthodox Greek Catholic Church so far as the deed is concerned. By its wording it does not particularly indicate which of the parties to this controversy was intended.

This then is a case where from the writing creating the trust, we are unable to discover what particular form of worship was intended or to which of the two churches the name of Greek Catholic Church is to be applied. And therefore according to doctrine laid down by Lord ELDON in Attorney-General v. Pearson, 3 Merivale, 353, affirmed or approved in Presbyterian Congregation v. Johnston, 1 W. & S. 9, McGinnis v. Watson, 41 Pa. 9, Sutter v. Trustees of Reformed Dutch Church, 42

Pa. 503, and Roshi's Appeal, 69 Pa. 462, that "when a house is created for religious worship and it cannot be discovered what was the nature of the worship intended by it, it must be implied from the usage of the congregation; and that it is the duty of the court to administer the trust in such manner as best to establish the usage, considering it a matter of implied contract with the congregation."

Again, in App v. Lutheran Congregation, 6 Pa. 201, cited with approval in Roshi's Appeal, 69 Pa. 462, by Justice SHARS-WOOD, Justice BURNSIDE says: "I approve of the doctrine of Lord ELDON in the case of the Attorney General v. Pearson, 3 Merivale, 400, that it is the duty of the court to decide in favor of those whether a minority or majority of the congregation who are adhering to the doctrine professed by the congregation, and the form of the worship in practice, as also in favor of the government of the church in operation with which it was connected at the time the trust was declared." We must look to the forms and usages of the congregation of this church prior to the controversy, to ascertain what was meant by the words in the deed, to the trustees creating them trustees of the " Greek Catholic Church of Wilkes-Barre, Pa."

As it is incumbent upon us to carry out the intention of those who established this trust, viewing this controversy in the light of the above authorities, what do we find? And what do these plain directions require us to do?

At the time the deed was taken by John Kosek for this church and parsonage property, August 28, 1899, the church had been completed and there was a regular pastor in charge.

Services were being held in the church and the congregation were united and satisfied. All, or nearly all at least testifying that these services were being conducted and that the pastor was teaching the doctrines believed and held by them and the same as taught by their pastors in their native country. Who then was the pastor in charge of this church and parish and to what church did he belong? And what religion or doctrine did he teach? The reply to this is not difficult. There is no dispute upon the point as to who was the pastor, none as to what church he belonged and very little that has any weight or is entitled to consideration as to the doctrines he taught.

The pastor was the Rev. Alexander Dzuby, and he belonged

to the United Greek Catholic Church, and he undoubtedly taught the principles and dogmas of the United Greek Catholic Church.

So when John Kosek accepted the deed for this property as trustee, the plain inference is that he held it first in trust to protect himself for the money advanced by him, or in other words to secure the repayment of his money, then after that in trust for the church organization, that was actually in existence at that place and conducting regular religious services, not for some other denomination, that had no existence as a church organization, had no pastor and was not conducting any religious services.

Again, at the time the deed was made by order of court from Elizabeth Kosek, widow of John Kosek and his successor in the trust, May 8, 1890, who was pastor of the church? Was he a member of and what religion or denomination did he teach? To this we make the same reply as was made to the former question in regard to deed to John Kosek, trustee. Rev. Alexander Dzuby was pastor, teaching the same as he did on August 28, 1889.

It seems to us that it is too plain for argument, that at the time these trusts were created, they were created for the Greek Catholic Church of Wilkes-Barre, Pa., as it was then being conducted, and that in this all were satisfied until converted or changed by the very accomplished Rev. Toth. We are confirmed and strengthened in our belief that this trust was originally for the Greek Catholic Church as the United Greek Catholic Church by the action taken by Rev. Toth when he came to visit this congregation in December, 1892. The first thing he did or required of this congregation and the trustees, was to renounce their belief in the doctrines and dogmas of the " United Greek Catholic Church."

Surely men need not renounce allegiance or belief in something that never existed. Had they never been members of that church, they certainly would never have been required to renounce allegiance to it or to renounce a belief in its doctrines and dogmas. Then, too, in this very renunciation it begins with the assertion, "we as Uniates," etc. This means, we as members of the " United Greek Catholic Church." So every defendant or nearly so has declared over his own signature that

up to the time of Rev. Toth's taking charge of the church, he had been a member of the United Greek Catholic Church. Again Rev. Toth says, they were held or considered as Uniates.

Then too this petition to Bishop Nicholas in effect admits that the churches to which they who signed it and their ancestors belonged in their native country were not Orthodox Greek Catholic Russian churches but "United" churches, when they say "which doctrine is taught only by the Holy Orthodox Greek Catholic Russian Church at present time, from which church our ancestors, not by their own fault, but through severe persecution, were compelled to abandon," admitting thereby that their ancestors had abandoned the Holy Greek Orthodox Church.

Believing that the evidence clearly shows that the United Greek Catholic Church was the church organization or denomination that was in possession of the church property at the time the trust was originally created, and that they continued in possession of the property up to the time that it was surrendered (by a portion of the congregation who renounced this belief or sect and joined the Orthodox Greek Catholic Russian Church) to the Orthodox Greek Catholic Russian Church, we feel constrained to restrain these defendants from interfering with the members of the United Greek Catholic Church, who have remained true to the faith of those in possession at the time the deeds were made to John Kosek and also to Mike Jevcsak, Michael Pevowarnick and Andrew Pevowarnick, trustees, etc., in their possession of the church property and in conducting services therein in accordance with the rules and under the forms of the United Greek Catholic Church.

.   *      *      *      *      *      *      *    .   *

Now, July 20, 1899, this cause came on to be heard on bill, answer and testimony, and after full argument by counsel, upon due and careful consideration, it is ordered, adjudged and decreed:

That the defendant, Rev. Alexis Toth, be restrained and perpetually enjoined from preaching or in anywise officiating as pastor in the church mentioned in plaintiff's bill and from occupying or using the said parsonage, and from intermeddling in any manner with the spiritual or temporal affairs of the said congregation unless he shall be regularly made and appointed

as pastor thereof by or under the authority of the " United Greek Catholic Church."

That the other defendants be strictly enjoined from permitting the said Rev. Alexis Toth in anywise to officiate as minister or pastor thereof without the consent of the same authority, and from interfering with or obstructing the proper functions of any regular priest or minister of the United Greek Catholic Church, whom the proper authorities of that church may appoint as pastor of the said church and congregation, and that the defendants pay the costs incurred, neither party, however, to file any costs for the attendance of witnesses.

*Error assigned* was the decree of the court.

*S. J. Strauss,* with him *J. T. Lenahan* and *E. F. McGovern,* for appellants.—Church property of a divided congregation is in that part whether majority or minority, which is acting in harmony with its organization : Schnorr's App., 67 Pa. 138; Roshi's App., 69 Pa. 462; McGinnis v. Watson, 41 Pa. 9.

In independent congregations governed solely within themselves, either by a majority of its members or by such other legal organization as they may have instituted for the purpose of ecclesiastical government, with no other specific trust attached to the property in the hands of the church, then that church is to be used for that congregation as a religious society. Where there is a schism which leads to a separation into distinct or conflicting bodies, the rights of such bodies to the use of the property must be governed by the principles which govern voluntary associations. If the principle in such cases is that majority rules, then the numerical majority must control the right to use the property: McGinnis v. Watson, 41 Pa. 9; Watson v. Jones, 13 Wallace, 679; Presbyterian Church v. Johnston, 1 W. & S. 9; Attorney General v. Pearson, 3 Merivale, 410 ; Keyser v. Stansifer, 6 Ohio (Hammond), 364; Fadness v. Braundborg, 73 Wis. 257 ; Schlichter v. Keiter, 156 Pa. 119.

*John McGahren,* with him *W. E. & C. A. Little,* for appellees. —The majority of the members of a church cannot leave the old and establish a new faith, nor can they even attorn to a dif-

ferent governing body of the same actual faith: St. Paul's Reformed Church v. Hower, 191 Pa. 306; German Reformed Church v. Seibert, 3 Pa. 282; Winebrenner v. Colder, 43 Pa. 244; McGinnis v. Watson, 41 Pa. 9; Sutter v. Trustees of 1st Ref. Dutch Church, 42 Pa. 503; Schnorr's App., 67 Pa. 148; Roshi's App., 69 Pa. 462; Landis's App., 102 Pa. 467; Schlichter v. Keiter, 156 Pa. 119; Krecker v. Shirey, 163 Pa. 534.

When the congregation of a church is divided, the title to the property is in the part, though a minority, which is in harmony with the laws, usages and customs accepted by the body before the division and which adheres to the regular organization: Bose v. Christ, 193 Pa. 13.

PER CURIAM, April 23, 1900:

The opinion of the learned court below contains an exposition of this controversy so full and exhaustive and so eminently in accord with the testimony taken on the hearing and with our own decisions, that we adopt it as the opinion of this court and affirm the decree for the reasons and upon the considerations therein expressed.

Decree affirmed and appeal dismissed at the cost of the appellant.