### St. Peter's Evangelical Lutheran Church et al. *v.* Kleinfelter, Appellant.

**148**

Argued March 13, 1929.

Before Trexler, Keller, Linn, Gawthrop, Cunningham and Baldrige, JJ. Modified and

*George R. Barnett,* and with him *James G. Hatz,* for appellant.—The court had no jurisdiction: Pitcairn v. Pitcairn, 201 Pa. 368; Caruso v. Gallo, 62 Pa. Superior Ct. 584; Schlecht's Appeal, 60 Pa. 172; Palmer v. Harris, 60 Pa. 156.

Plaintiffs were guilty of laches: Commonwealth ex rel. v. Bala & Bryn Mawr Turnpike Co., 153 Pa. 47; Bailey's Estate, 241 Pa. 230; Dalzell v. Lewis, 252 Pa. 283; Penn R. Co.'s Appeal, 125 Pa. 189; Philadelphia & Reading Coal & Iron Co. v. Schmidt, 254 Pa. 351.

*John R. Geyer,* and with him *Mark T. Milnor, William H. Earnest* and *Paul G. Smith,* for appellee.—The court had jurisdiction: Gettengel v. Robinson et al., 288 Pa. 362; Kitchen v. Wilkinson, 26 Pa. Superior Ct. 75; Brown v. Lutheran Church, 23 Pa. 495; Boyce

v. Kalbaugh, 47 Md. 334; 28 Am. Rep. 464; Jeffreys
v. Pittsburgh, 13 Pittsburgh Law Journal (N. S.) 21;
First Presby. Church v. Second Presby. Church, 2
Brewster 372.

OPINION BY GAWTHROP, J., April 10, 1929:

The plaintiffs filed a bill in the court below to en-
join the defendant from desecrating a burial ground
in Middletown, Dauphin County. This is an appeal
from a final decree restraining and enjoining the de-
fendant from using or maintaining lot No. 108 on the
plan of the Boro. of Middletown in any manner what-
soever except as a burial ground; from using or main-
taining the buildings and other structures on the lot,
and ordering him forthwith to remove the buildings
and structures which he has been using and which he
has erected on said lot and replace and restore all
tombstones wrongfully removed by him, and to pay
the costs of the proceeding.

Since it is necessary, in considering some of the
questions raised by the assignments of error, to know
the facts in the case, we shall summarize such as are
pertinent. As the appellant has not assigned as error
the overruling of any of his exceptions to the chan-
cellor's findings, they must be taken as admitted.
From these findings it appears that in the year 1760
one George Fisher dedicated the lot in question, being
lot 108 on a plan made by him, as a burial ground
and designated it as the "German Lutheran Burial
Ground," but gave no deed for it. There was a Ger-
man Lutheran congregation existing at the time in
Middletown. This congregation took control of the
burial ground and upwards of two hundred persons
were interred in it up to the year 1800, when it was
filled. Not more than two bodies were ever disinterred
and removed from the lot. The German Lutheran
Congregation was incorporated in the year 1807 under
the name "The Trustees of the German Lutheran

Church of St. Peter." That congregation cared for the burial ground for about seventy-five years. In 1898 the corporate name of the congregation was changed to "St. Peter's Evangelical Lutheran Church in Middletown, Dauphin County, Pennsylvania." From about 1875 no care was given to the burial ground by anyone and it became in a much neglected condition. In 1901 one Martin Snyder went upon this burial ground and removed the remaining portions of the fence which surrounded the lot and some of the tombstones; built a blacksmith and wagon shop over some of the graves; placed some of the tombstones in the wall of the shop and enclosed the remaining, or northern portion of the lot, with a fence. He leased the blacksmith and wagon shop for a money rental and used, and permitted others to use, the northern portion of the lot for impounding cattle and horses. No complaint was made by anyone to Snyder, except one Parthemore, who was a descendent of one or more of the persons buried in the lot. Some time after Snyder had taken possession of the lot he permitted Parthemore to go upon it and erect a fence around the graves of his ancestors. Amanda Snyder, widow and devisee of Martin Snyder, leased the shop to the defendant. On January 2, 1920, she made a deed of conveyance for the lot to the defendant and his brother, Howard Kleinfelter. She announced at the public sale at which the Kleinfelters bought the lot that Martin Snyder had no deed for the lot. On November 30, 1923, the defendant acquired title to the one-half interest of his brother in the lot. He knew that it was a burial ground and purchased it as such. The grave of Peter Shuster, a Revolutionary War Soldier buried therein, is still visible, and the tombstone marking it is standing. In 1921 a committee of the Chapter of the Daughters of the Revolutionary War went upon the northern part of the lot and located and decorated five graves of Revolutionary War Soldiers and continued to decorate

annually thereafter until 1925, when all of the tomb-
stones in that portion of the lot had been removed,
except that of Peter Shuster. In 1925 protest and
complaint was made by a member of the Church (one
of the plaintiffs) and the pastor thereof to the defend-
ant against the use he was making of the lot. Sarah
Starr, one of the plaintiffs, is a lineal descendent of
John Myers, a Revolutionary War Soldier, whose body
lies in the burial ground. Rachel Springer, another
of the plaintiffs, is a lineal descendant of George
Fisher, who dedicated lot No. 108 as a burial ground.

The assignments of error are to: (1) the final
decree; (2) the overruling of the defendant's motion
to strike off plaintiff's bill; (3) the dismissal of the
defendant's preliminary objections to the bill; (4) the
overruling of the defendant's motion to strike off
the plaintiffs' replication; (5) the form of the decree
nisi; (6) the overruling of defendant's exceptions to
the decree nisi; and (7) the order refusing a re-hear-
ing. Of these seven assignments the 2nd, 3rd, 4th, 6th
and 7th violate rule 28 of this court, which requires
that "when the error alleged is the granting or re-
fusing of a motion, ..... the assignment must quote
verbatim the motion or rule and the judgment of the
court thereon," and may be disregarded. However,
we have carefully examined the record and are satis-
fied that the complaints upon which these assignments
are based are without substantial merit. The only
assignment of error which is self-sustaining, and prop-
erly raises any questions before us is the first, which
complains of the final decree.

It is contended that equity has no jurisdiction of
the subject matter of the bill; not, however, on the
ground that the suit should have been brought at law,
but because, jurisdiction in equity in Pennsylvania
being statutory there is no statute under which it can
be held that equity had jurisdiction. This is a ques-
tion which may be raised at any time in the proceed-

ings; for jurisdiction of the subject matter cannot be conferred by estoppel: Wettengell v. Robinson, 288 Pa. 363. The question of jurisdiction depends on the averments in the bill and not on answer and testimony: Bank of Pittsburgh v. Purcell, 286 Pa. 114. The bill averred that the defendant had taken possession of a lot of ground dedicated and maintained as a cemetery or burial ground and was doing acts which amounted to a desecration thereof. It seems quite clear that these averments bring the cause of action within the purview of that part of section 13 of the Act of June 16, 1836, P. L. 789, which conferred on the court of common pleas of Philadelphia County the power and jurisdiction of courts of chancery so far as relates to "the prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals." As this jurisdiction of the court of common pleas of Philadelphia County was extended to the court of common pleas of the several counties of the Commonwealth by the Act of February 14, 1857, P. L. 39, the contention that there was lack of jurisdiction in equity is without merit.

The next contention is that the plaintiffs were not proper parties to file the bill. The argument in support of it is grounded solely upon the proposition that two of the plaintiffs sue as members of unincorporated associations; that a member of an unincorporated association cannot bring a suit in his own name for the benefit of the association without exhibiting the articles or instrument giving him such right; and that the right or authority was not shown. Conceding for present purposes, but not deciding, that the objection to these two plaintiffs as parties is well founded, it is manifest that this question is not properly raised by any assignment of error, and, therefore, is not properly before us. One of the prelimi-

nary objections filed to the original bill and to the amended bill under equity rule 48 was that the bill shows on its face that none of the plaintiffs are entitled to the relief prayed for. This and all other preliminary objections were dismissed in an opinion holding that the plaintiffs are seeking to avert an injury common to all of them, and the record shows that no exception was taken to the order.

The next contention of the appellant is that it was error to enter the final decree, because the right of the plaintiffs to equitable relief was barred by their laches. The chancellor found, and all the evidence is to the effect, that it was not until the defendant commenced the erection of sheds on the northern portion of the lot in 1925 that there was a protest by anyone against what was being done upon the burial ground. At that time a protest was made on behalf of the congregation of the St. Peter's Evangelical Lutheran Church, through its pastor. Laches in a general sense is the neglect, for an unreasonable and unexplained length of time, under circumstances permitting diligence, to do what in law should have been done. More specifically, it is inexcusable delay in asserting a right; such delay in enforcing one's rights as works disadvantage to another: 21 C. J. 210. But there is no absolute rule as to what constitutes laches or staleness of demand. Each case is to be determined according to its own particular circumstances. The question of laches is addressed to the sound discretion of the chancellor and his decision will not be disturbed on appeal, unless it is so clearly wrong as to amount to an abuse of discretion: 21 C. J. 217. In determining whether there has been such inexcusable delay as to amount to laches, various matters are to be considered, among which are the nature of the right asserted and the character of the duty or obligation sought to be enforced. As properly observed by the chancellor, "the plaintiffs in this case are not asserting any right,

claim or demand for themselves. They are asking that this court stay the hand of the defendant in further desecrating a burial ground, and that he remove therefrom all marks and instrumentalities of desecration which he had been employing for his gain. He has been, and is, using the blacksmith and wagon shops unlawfully erected and used by his predecessor over the graves and bones of the dead. He is using some of the tombstones which stood in this graveyard, in the walls of the blacksmith shop. He is violating the law in all of this. The purpose of the rule above referred to (that equity aids the vigilant and not those who slumber on their rights) is for repose of title, claims and demands for the peace and order of society. It is not equitable to apply it when and where it will have the contrary effect.'' We do not find that the doctrine of laches has ever been applied in a proceeding to restrain the desecration of burial grounds. In Brown v. Lutheran Church, 23 Pa. 495, our Supreme Court said: ''Pennsylvania, with a refined sense of what is due to both the dead and the living, has forbidden, by statute, the opening of streets, lanes, alleys or public roads through any burial ground or cemetery, and has provided a penalty for wilful injuries done to graveyards —not only to the tombstones and fence-railings, but even to the 'shrubs and plants' which bereaved love cultivates in such places. The sentiment is sound, and has the sanction of mankind in all ages, which regards the resting place of the dead as hallowed ground, not subject to the laws of ordinary property, nor liable to be devoted to common uses.'' It was held in that case that a burial ground was not within the spirit and meaning of the statutes of partition. The defendant testified: ''I thought I was buying a cemetery or I wouldn't have bought it.'' He must be conclusively presumed to know that he was a wrongdoer when he did anything to further desecrate this hal-

lowed ground. In these circumstances equity will turn a deaf ear to him when he asserts the doctrine of laches as a reason for staying the arm of the chancellor for protecting the resting place of the dead. The language of Mr. Justice MITCHELL in Pa. S. Val. R. R. v. Paper Mills, 149 Pa. 18, 21, is in point: "It is averred in the bill that the buildings are upon a public street, and if so defendants must be conclusively presumed to know that they were wrongdoers in the erection, and it may be doubted if want of formal notice or anything short of acts of encouragement, would estop the complainant."

The only other contention made in behalf of appellant which we deem to be properly before us is that the decree penalizes him for the acts of Martin Snyder. We understand that by this it is meant to challenge the right of the court below to require him to remove the buildings and structures which Snyder erected before the appellant took possession. In our view the mandatory order to remove structures should be limited to those structures erected by the appellant, and that the decree should be modified to that extent. This does not authorize the use of any of the structures by him. To that end the record is remitted to the court below with directions so to modify the decree.

As so modified, the decree is affirmed at the costs of appellant.