Gabster, Appellant, *v.* Mesaros.

Argued March 22, 1966. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*John A. Metz, Jr.,* with him *Richard M. Sharp, Earl R. Handler,* and *Metz, Cook, Hanna & Kelly,* and *Sharp & Gilpatrick,* and *Handler & Malcolm,* for appellants.

*R. Carlyle Fee,* with him *Serene & Fee,* for appellees.

OPINION BY MR. JUSTICE EAGEN, June 24, 1966:

The court below ruled that this equity action was barred by laches and entered judgment for the defendants on the pleadings. The plaintiffs appeal.

It is fundamental that judgment on the pleadings should be entered only in a clear case: *Bureau of Child C. v. United Fund,* 416 Pa. 617, 207 A. 2d 847 (1965).

For the purpose of this appeal, these facts must be accepted as true:

The plaintiffs are members of the congregation of the Greek Catholic Church of Clymer, Indiana County, Pennsylvania. The Church began as an unincorporated association prior to the year of 1907. During 1907, it was incorporated as a nonprofit corporation for the purpose of worshiping God according to the faith, doctrine and discipline of that branch of the Greek Catholic Church, which is in union with the The Holy See at Rome, and recognizes the Pope of Rome as the spiritual head of the Church. From its founding until the year 1935, the Church conducted all of its affairs, both spiritual and temporal, as a Greek Catholic Church in union with Rome, and all of its property was acquired and used for this purpose.

In 1935, the defendant, The Most Reverend Bishop Orestes P. Chornock, founded a sect or denomination known as the "Carpatho-Russian Greek Catholic Orthodox Church of North and South America", which has since been renamed the "American Carpatho-Russian Orthodox Greek Catholic Diocese of the United States of America." This sect is not in union with Rome, but recognizes the ecclesiastical jurisdiction of the Eastern Patriarch in Istanbul.

In 1935, Bishop Chornock persuaded the subject Church to abandon its union with the Church of Rome and to associate itself with his denomination. Since that time continuously until 1964, the Church has been

under the spiritual leadership of Bishop Chornock who has regularly assigned and removed priests, who served the parish and administered the property and assets of the Church as one of his diocese.

This action, instituted on December 23, 1964, complains that the actions of Bishop Chornock, as above related, constituted an illegal diversion of the property of the Church from the purposes for which it was originally organized, and asks that such diversion be restrained in futuro. Bishop Chornock, the Church Corporation, and Reverend Frank Mesaros, a priest assigned by Bishop Chornock to administer the needs of the parish, are named defendants.

As noted before, the lower court ruled that the relief sought is precluded by laches. The plaintiffs contend: (1) The doctrine of laches does not apply to church disputes because of the singular concepts involved in regard to the ownership and use of property dedicated to religious worship; and, (2) In any event, the facts do not warrant the application of the doctrine of laches, because no prejudice or injury to the defendants is evident at this stage of the case.

The ruling below was correct, and we affirm.

Laches is an equitable doctrine, and its purpose is for the repose of title, claims and demands for peace and order in society. See, *St. Peter's Evan. Luth. Ch. v. Kleinfelter,* 96 Pa. Superior Ct. 146 (1929). The question of its application does not depend upon the fact that a certain definite time has elapsed since the cause of action accrued, but rather whether, under the circumstances of the particular case, the complaining party or parties are chargeable with want of due diligence in failing to institute or prosecute the claim: *Lutherland, Inc., v. Dahlen,* 357 Pa. 143, 53 A. 2d 143 (1947). Ordinarily, the passage of time, in itself, is insufficient to warrant the application of the doctrine, and it must further appear that injury or material

prejudice has resulted to the defendant through the delay: *Brodt v. Brown,* 404 Pa. 391, 172 A. 2d 152 (1961), and *Hostetter v. Sterner's Gro., Inc.,* 390 Pa. 170, 134 A. 2d 884 (1957). However, where the delay in asserting the claim involves a grossly unreasonable time, the necessity for specifics regarding prejudice or injury becomes less crucial.

That the plaintiffs delayed for a grossly unreasonable period of time in asserting the present claim is patently clear. Further, it is self-evident that the defendants and other members of the Church will suffer material prejudice in asserting and defending their rights, and also suffer material injury if the plaintiffs' claim is sustained.

Whether or not the subject Church was founded and dedicated as one in union with Rome is one of the vital questions in issue. As a result of the plaintiffs' knowing acquiescence for thirty years, without taking action, in the existence of conditions about which they now complain, the original purpose of the Church has become obscure, the testimony of important witnesses no longer available, and the ascertainment of the true facts rendered much more difficult, if not impossible. Compare, *First Nat. Bk. v. Lytle Coal Co.,* 332 Pa. 394, 3 A. 2d 350 (1939), and *Barnes & Tucker Co. v. Bird Coal Co.,* 334 Pa. 324, 5 A. 2d 146 (1939). Moreover, plaintiffs advance no reason for the prolonged delay in properly asserting their claim. Further, those members of the congregation who have practiced the form of worship which the Church has followed continuously for thirty years, and for whom the named defendants are acting in a representative capacity, have contributed substantial sums of money thereto in justifiable reliance that the Church would continue to follow the theological course and spiritual beliefs to which they adhere. It is obvious that to now permit the Church property and assets to be used for another purpose

would result in serious injury to them. See, *Tozier v. Brown,* 202 Pa. 359, 51 A. 998 (1902).

While laches is an affirmative defense and ordinarily will not be applied until after full inquiry into all of the circumstances, if the fact of laches appears on the face of the pleadings, relief may be denied on this ground: *Grange Nat. Bk. v. First Nat. Bk.,* 330 Pa. 1, 198 A. 321 (1938), and *Blank & Gottschall Co. v. First Nat. Bk.,* 355 Pa. 502, 50 A. 2d 218 (1947).

It is also our studied conclusion that the doctrine of laches applies in disputes of the nature presented. Other jurisdictions have so ruled. See, *Saint Nicholas Ruthenian G.C.C. v. Kapsho,* 202 Misc. 893, 114 N.Y.S. 2d 27 (1952), and *Greek Catholic Church v. Roizdestvensky,* 67 Col. 217, 184 Pac. 295 (1919). See also, Notes, 75 Harv. L. Rev. 1142, 1163 (1962).

It is the law in Pennsylvania that when property, real or personal, is vested in a religious society for the worship of Almighty God, that it is a charitable use and such use cannot be diverted from that to which it was originally and lawfully dedicated. Stated another way, if a congregation has been organized and holds its property as a constituent part of any particular religious denomination, it cannot sever itself from such religious denomination without forfeiting its rights and property to those of the organization, who maintain the original status. This has not only been established by common law development, but is mandated by statute. See, Act of June 20, 1935, P. L. 353, §1, 10 P.S. §81; *Kraftician v. Greek Cath. Congregation,* 366 Pa. 431, 77 A. 2d 875 (1951) ; *Canovaro v. Bros. of H. of St. Aug.,* 326 Pa. 76, 191 A. 140 (1937) ; *Greek Church v. Greek Church,* 195 Pa. 425, 46 A. 72 (1900) ; and, *App v. Lutheran Congregation,* 6 Pa. 201 (1847).

In view of this, plaintiffs argue the application of laches in a church property dispute is incompatible

with the church trust doctrine, and that since the congregation itself cannot divert the use of the church property from its original purpose, a fortiori, no measure of acquiescence on the part of the congregation can effectuate the same result. This is not the issue presented.

By applying the doctrine of laches to the present facts, we are not holding that church property can legally be diverted from the purpose for which it was acquired and dedicated, rather do we rule that courts of equity will not grant relief to individuals who sleep on their rights for an unreasonable period of time to the prejudice of others involved. Further, §2 of the Act of June 20, 1935, supra, 10 P.S. §81a, which is controlling on the issue of how church property shall be held, specifically places disputes in regard thereto within the jurisdiction of the courts of equity. It is reasonable to assume, therefore, that the legislature intended that all equitable principles shall apply, including the doctrine of laches, unless their application would destroy the effect of the rule of law enunciated in the statute.

To determine whether the basic law as to the ownership and use of church property will be thwarted, we must consider its rationale and purpose. Two theories in support of the principle of law have evolved. Some courts apparently concerned with continuity of title to property have based the rule on the fact that a church entity is defined by its doctrinal coherence. See, *Geiss v. Trinity Lutheran Church Congregation*, 119 Neb. 745, 230 N.W. 658 (1930). Other courts have reasoned that the basis for the doctrine lies in the desire of the courts to carry out the intent of the original donor or donors of the church property, and have assumed that such individuals would have continued in the original faith. Pennsylvania seems to follow the latter rationale. See, *Trustees v. Sturgeon*, 9 Pa. 321 (1848).

However, the former has also been favorably recognized in recent decisions. See, *Kraftician v. Greek Cath. Congregation,* supra; *Church of God v. Church of God,* 355 Pa. 478, 50 A. 2d 357 (1947); and, *Canovaro v. Bros. of H. of St. Aug.,* supra.

Whichever rationale is used, we see no reason why the application of the doctrine of laches would do violence to the basic law. If we consider it to be based on the continuity of title doctrine, the continuity was disrupted herein thirty years ago. From that point on, the "Dissenters" were in possession, and the plaintiffs slept on their rights. If frustration of the original donors' intent is the primary concern, again that frustration occurred thirty years ago, and the complaining parties cannot seek the assistance of the courts after such unwarranted, unreasonable and prejudicial delay.

Further, the rule of law as to how church property is held was, undoubtedly, adopted in Pennsylvania and the United States to give the courts a means of resolving church disputes without becoming enmeshed in the difficult theological questions such disputes entail. See, *Watson v. Jones,* 80 U.S. 679 (1871). Where, as in the instant case, no objection has been raised for thirty years to the form of religious worship practiced in the subject church, to permit such objections to be asserted at this late date in a court of law would lead to multiple lawsuits and lack of finality as to title to church property.

Decree affirmed. Each side to pay own costs.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The meager authority upon which the majority bases its conclusion that laches is applicable does not satisfy me. It introduces into our law of property a new concept, namely, that one may obtain title to real-

ty on the weakness of the titleholder's claim rather than on the strength of his own.

In Pennsylvania, the Implied-Trust Doctrine places the title of this real estate in the congregation that organized the church. I know of no theory of laches that is applicable to such a situation so as to divest from ownership those in whom title is vested.

Further, in this instance, prejudice, which is an ingredient of laches, has not been shown; neither has adverse possession—which might be applicable—been alleged.

Since the record does not disclose facts which would permit the application of laches, and since it does disclose facts which would indicate adverse possession, I would apply the Implied-Trust Doctrine and reverse the decree.

I dissent.