**Pearlstine v. Fry**

*Alan Boroff,* for plaintiff.

*Donald Semisch,* for defendant.

TREDINNICK, J., May 20, 1971.—In this equity action, plaintiff, Raymond Pearlstine, Esq. (Pearlstine), seeks specific performance of an oral contract for the purchase of 50 shares of Chatham Broadcasting Company, Inc. (Chatham), capital stock from defendant, Clyde R. Fry (Fry). Defendant Fry filed an answer, new matter and counterclaim demanding that Pearlstine deliver the share certificates owned by Fry to him. A hearing on the matter was held before the undersigned on February 23, 1971.

## FINDINGS OF FACT

1. Plaintiff, Raymond Pearlstine, is an attorney at law, and is corporate secretary of Chatham.

2. Defendant, Clyde R. Fry, is a certified public accountant, and is, and has been since its incorporation, accountant for Chatham.

3. Defendant, Chatham Broadcasting Company, Inc., is a corporation engaged in the radio broadcasting business, with its principal activity being conducted in Siler City, N. C.

4. Fry purchased 50 shares of Chatham on February 28, 1962.

5. On May 12, 1965, at a meeting in Pearlstine's office in Norristown, Pa., an oral contract was entered into between Pearlstine and Fry whereby the former was to buy, and the latter sell, 50 shares of Chatham stock for $6,500.

6. The oral terms of the agreement contained no provisions with respect to time of performance, nor were there any discussions or explicit agreement with respect to compliance with applicable Federal Communications Commission regulations. Pearlstine subsequently undertook the obligations of procuring the

necessary Federal Communications Commission forms and commencing the completion thereof. Fry assumed that Pearlstine would so do.

7. Pearlstine determined that F.C.C. Form 315 had to be completed and filed with the commission prior to the transfer of stock.

8. In July 1965, Pearlstine obtained Form 315 and forwarded it to Chatham's executive officers for insertion of certain data thereon. The form was returned to him with the requisite data, but was subsequently lost.

9. In July 1967, Pearlstine forwarded a new Form 315 to Chatham, received it back properly filled out, and then wrote to Fry to obtain certain financial information necessary to complete the form. In response thereto, Fry, on July 17, 1967, advised Pearlstine by letter that "Because of the unreasonable length of time which has expired and the resulting change in circumstances, I am unwilling to make a sale of my shares in Chatham Broadcasting Co. of Siler City at this time."

10. Between July 1965, when Pearlstine first attempted to complete Form 315, and July 1967, when he renewed his efforts in that regard, such effort was not pursued by Pearlstine during certain periods because:

(a) During the months of July through October, 1965, he was immersed in negotiations involving an international trade agreement, and was unable to devote time to his personal matters.

(b) From the latter part of July 1966, until the latter part of September 1966, he was out of his office due to illness.

(c) Chatham applied for renewal of its license to the F.C.C. in September 1966. Notification of the renewal of the license was not received until March 20, 1967. Pearlstine was advised by counsel that it would be highly undesirable, during the pendency of the renewal application, to apply for transfer of the shares.

11. Although the parties were in contact frequently, Fry never demanded performance of the contract by Pearlstine at any time between the date of the contract, May 12, 1965, and his attempted unilateral termination thereof on July 17, 1967.

12. The value of Chatham stock increased between the date of the contract and July 17, 1967, by reason of two factors: (1) accumulation of a reserve for depreciation, and (2) a possible increase in the appraisal of value multiple accepted in the industry as a valuation method.

13. The increase in value of Chatham stock attributable to the increase in the appraisal of value multiple was insubstantial. The increase occasioned by accumulation of a reserve for depreciation resulted from accounting techniques instituted by and, therefore, well known to, and predictable by Fry as of the date of the contract.

## DISCUSSION

Defendants contend that Pearlstine's delay of over two years in completing the prerequisites to transfer of the stock (completing and filing with the F.C.C. of a certain form) not only constitutes a material breach of the contract, but also precludes Pearlstine from enforcing the contract on the basis of laches coupled with changed circumstances.

Pearlstine contends that time was not of the essence of the contract, and that the delay was not unreasonable under all the attendant circumstances.

It is, of course, axiomatic that a material breach of a contract by one party will excuse performance by the other. Sisney v. Diffenderffer, 323 Pa. 337 (1936). The single issue here involved is whether Pearlstine's delay in performance was a material breach of the contract, thus justifying Fry's refusal to perform.

Delay in performance alone is not material, unless time is of the essence of the contract or the delay prejudices the other party in that it prevents his receiving substantial performance. Time is not ordinarily of the essence of a contract unless made so by express terms, or unless there is something connected with the purpose of the contract and the circumstances surrounding it which make it apparent the parties intended that the contract must be performed at or within a certain time: Carsek Corp. v. Stephen Shifter, Inc., 431 Pa. 550 (1968); Restatement, Contracts, §276.

Fry contends that time was of the essence, since section 1.615 of the F.C.C.'s rules and regulations mandate that a supplemental ownership report (Form 323) must be filed with the commission within 30 days after any change occurs in the ownership of stock. However, Fry has either misconstrued that section or the import of his contract with Pearlstine. That regulation is not applicable, by its express terms, until the actual transfer of stock has taken place. Obviously, the contract of May 12, 1965, did not effectuate a transfer of the stock; it was an agreement to transfer stock in the future. Furthermore, an actual transfer of stock at that time would have violated section 1.540 of the commission's rules and regulations requiring that Form 315 (Transfer of Control) be filed with the commission 45 days prior to the contemplated effective date of transfer of control. Therefore, there was no requirement that any F.C.C. form be filed within a specific time after the date the contract was made, and commission regulations do not impute to the contract the concept that time was the essence thereof.

Notwithstanding that time was not of the essence, was there an unreasonable delay in performance by Pearlstine? The delay in completion of the contract

was occasioned solely by the failure to file Form 315 with the F.C.C. It is clear that the obligation to complete whatever procedures or forms required by the F.C.C. (the evidence indicates the parties had no precise information in this regard on the date of the contract) was not placed on either party under the terms of the contract. Pearlstine assumed that duty, and Fry was content that Pearlstine handle it. Despite the fact that the parties were in frequent contact concerning other matters, Fry never once complained to Pearlstine about the delay in processing Form 315. Even if the delay was unreasonable (and we have concluded that it was not), under these circumstances it would have been excusable in light of Fry's utter lack of communicated concern over a matter which was not, under the contract, an explicit duty of either party to perform.

As noted, however, we conclude, under all the circumstances, that the delay in performance was not unreasonable. It did not prevent Fry from obtaining substantial performance, and Fry has not shown any injury or material prejudice resulting therefrom.

Fry testified that, in his opinion, the value of his 50 shares of Chatham increased from $6,500 in May 1965, to $40,000 in July 1967. However, Fry testified that said change in value arose only by reason of changes in two accounting techniques, the appraisal of value multiple and the reserve for depreciation. The first of said changes, the appraisal of value multiple (a figure multiplied times gross revenue, minus liabilities supposedly thus yielding value) changed from one, or one and one-half, to two. This difference could hardly account for such a drastic change in the value of the Chatham stock, since the net worth of the corporation only increased a few hundred dollars over the two-year period.

The other accounting change, an increase in the reserve for depreciation, was planned by, and known to, Fry at the time he entered his contract with Pearlstine. Therefore, he cannot rely on said change to establish a "change in circumstances."

Finally, the question of laches. Laches is an equitable doctrine pursuant to which a plaintiff may lose his right to equitable relief. The application of the principle depends upon whether, under the circumstances of the case, plaintiff is chargeable with want of due diligence in failing to institute or prosecute his claim: Gabster v. Mesaros, 422 Pa. 116 (1966).

The passage of time itself is insufficient to warrant the application of laches. It must further appear that injury or material prejudice has resulted to defendant through the delay: Gabster v. Mesaros, supra; Brodt v. Brown, 404 Pa. 391 (1961). Such is not the case here.

In the absence of fraud or concealment, the general rule is that laches follows the statute of limitations: Elias v. Elias, 428 Pa. 159 (1968). In this case, Pearlstine's cause of action against Fry did not accrue until Fry notified Pearlstine on July 17, 1967, that he was not willing to sell his Chatham shares. Since Pearlstine's complaint was filed on December 7, 1967, well within the statute of limitations, the defense of laches is not available to Fry.

## CONCLUSIONS OF LAW

1. The oral contract entered between Pearlstine and Fry on May 12, 1965, was a valid, enforceable and binding contract.

2. Time was not of the essence in said contract.

3. The delay in performance by Pearlstine was not unreasonable.

4. Pearlstine did not materially breach his contract with Fry.

5. Laches is not available to Fry as a defense.

6. Pearlstine is entitled to the relief which he seeks.

7. Fry is not entitled to the relief he seeks in his counterclaim.

## DECREE NISI

For all the foregoing reasons, this court decrees that:

(a) Defendant, Clyde R. Fry, is enjoined from encumbering his 50 shares of Chatham Broadcasting Company, Inc., of Siler City, N. C., in any way and from selling or conveying same or attempting to effect a transfer of some or any part thereof to any person other than plaintiff, Raymond Pearlstine;

(b) Defendant, Clyde R. Fry, is commanded to specifically perform his contract with plaintiff, entered May 12, 1965, and to legally sign, seal, acknowledge and deliver all forms and other information required by the Federal Communications Commission in order to consider the application for consent to transfer of control of Chatham Broadcasting Co., Inc., of Siler City, N. C.;

(c) Upon securing the necessary approval from the Federal Communications Commission for the transfer of the said shares, defendant, Clyde R. Fry, shall, by good and sufficient assignment, assign, transfer and convey the said shares of stock with marketable title and free of all encumbrances to plaintiff, Raymond Pearlstine, upon receipt of the contract price, $6,500;

(d) Defendant, Chatham Broadcasting Co., Inc., of Siler City, N. C., is enjoined from accepting for transfer or from transferring on its books and records the said

50 shares of stock owned by defendant, Clyde R. Fry, to any person except plaintiff, Raymond Pearlstine;

(e) Defendant Clyde R. Fry's counterclaim for delivery of the said stock is dismissed.

If no exceptions are filed within 20 days after notice of the filing of the adjudication, this decree nisi shall be entered by the prothonotary on praecipe as the final decree.

## OPINION SUR EXCEPTIONS

TREDINNICK, J., January 12, 1972.—Defendants have filed six exceptions to the chancellor's findings of fact, seven to the conclusions of law and to the decree nisi. These exceptions having been briefed and argued, the matter is before us for final disposition.

Taking the exceptions in sequence, it is contended, first, that findings of fact numbers 5 and 6 are in error in failing to state that the oral contract between the parties included an agreement that plaintiff would undertake to complete the requisite filings with the Federal Communication Commission. We do not so view the factual situation. The problem of dealing with the F.C.C. was an afterthought. When it did engage the attention of the parties, in May 1965, some three months after the contract had been entered into, defendant Fry inquired of plaintiff as to who would handle the matter, and plaintiff volunteered with the words, "As soon as I get a breather, I will start to work on these (forms) and will be in touch with you." Defendant was apparently content with that arrangement, and it hardly rises to the level of a term of the contract.

Defendants next complain of finding of fact number 10, which alludes to the reasons plaintiff failed to complete F.C.C. Form 315 during certain periods of time.

The attack upon this finding is apparently based not so much upon alleged factual error, but rather upon the implication to be drawn from these facts. Defendants urge that the reasons given by plaintiff for failing to complete Form 315 cannot excuse delay in performance of the contract. That issue cannot be isolated from an overall consideration of the case. The question, as heretofore noted, is whether, *under all the circumstances*, the delay in performance was unreasonable. Obviously, the reasons for failing to complete the form are part of the circumstances; therefore, a finding in that regard was certainly proper. The manner in which plaintiff undertook the task of completing Form 315 ("As soon as I get a breather . . .") indicates that his work had priority, and, therefore, may be considered an excuse, within reason. Equitably, his illness in all fairness should be treated similarly. And, finally, his deliberate delay during the period when the corporation's application for renewal of license was pending was prudent and in the best interests of the corporation. These are factors which cannot, and should not, be ignored.

The objection to the eleventh finding of fact (that defendant never demanded performance of the contract) is similarly an objection to the import of that finding rather than to the fact itself. It is crystal clear from the testimony that, in fact, defendant was in frequent contact with plaintiff over the period, and not only did not request plaintiff to expedite the matter, but never mentioned the agreement at all. At the risk of being repetitious, we consider that defendants' utter lack of communicated concern over a procedural prerequisite to performance of the contract, not an explicit duty under that contract of either party to perform, in itself excuses plaintiff for any delay thus caused.

Finally, with respect to the findings of fact, defendant excepts to findings 12 and 13, which recite that

although the value of the stock may have increased during the delay, the increase was insubstantial. As heretofore noted, defendants' contention that the stock had substantially increased in value by mid 1967 was based upon two factors, an alleged increase in the "appraisal of value multiple," and in the reserve for depreciation account. The "multiple" increase may be quickly dismissed. Defendant himself referred to that as "mere conjecture." As to the increase in the reserve for depreciation, obviously that increase is offset on the balance sheet by a decrease in the value of the equipment being depreciated. There is no testimony that this does not accurately reflect the true financial condition of the corporation. Absent such testimony, we must assume it does. Therefore, the records indicating an increase in net worth of only a few hundred dollars likewise must be assumed correct.

We conclude that the findings of fact were supported by the evidence, and, in turn, led the chancellor to the correct conclusions of law, and, with but one exception, to the correct decree. Defendant had contended at the hearing that he was at least entitled to interest on the purchase price from May 1965, when plaintiff undertook the task of completing the F.C.C. form, until July 1967, when defendant attempted to terminate the contract. Defendant on these exceptions argues that the chancellor should have so ordered and, in addition, should now provide for interest to be paid defendant from May 1965, to the date of transfer of the stock. In support of this expanded claim for interest, defendant points to plaintiff's offer to so do as set forth on pages 94 and 95 of the notes. In light of that offer, we will amend the decree nisi to so provide.

### FINAL DECREE

And now, January 12, 1972, subparagraph (c) of the decree nisi is amended to provide that defendant Claude R. Fry shall transfer the stock upon receipt of

the contract price, $6,500, plus simple interest thereon at the annual rate of six percent computed from June 1, 1965, to the date of transfer. In all other respects, the decree nisi shall be the final decree of the court.