## Pearce *against* Olney.

A court of equity will interfere to restrain the use of an advantage gained in a court of ordinary jurisdiction, where such advantage has been gained, by the fraud, accident or mistake of the opposite party.

A, a manufacturing company in this state, having had dealings with *B*, a dealer in *New-York*, *C*, as the agent of *A*, purchased a quantity of iron of *B*, knowing that *A* was the party with whom he was contracting. Afterwards, *B* brought a suit for this iron, against *C* individually, in the superior court of the city of *New-York*, and process was duly served on *C*, by arresting his body. Soon after the suit was instituted, *C* called on *D*, the attorney of *B*, and explained to him the circumstances under which the contract was made, and the mistake in suing him individually, instead of *A*, his principal. *D* said to *C*, that he would see him again on the subject. This *D* did not do; but he, shortly after, wrote *C* a letter, informing him, that nothing would be done in relation to that suit, until further notice should be given him. *C*, relying on this communication, and hearing nothing further from *D* or *B*, did not appear, in person or by attorney, before the court to which the process was returnable; but *D* appeared, and obtained a judgment in said suit against *C*, without his knowledge, for 581 dollars, damages, and 32 dollars, costs. The record of such judgment stated, that on the first *Monday* of *April*, 1846, came, as well the plaintiff, by his attorney, as the defendant, in his proper person ; and the defendant defends the wrong and injury, and says nothing in bar or preclusion of said action ; wherein the plaintiff remains therein undefended against the defendant. In *November* 1848, *B* brought, in this state, an action of debt on the judgment so obtained in *New-York*, during the pendency of which, *C* filed his bill in chancery to restrain *B* from enforcing his judgment. Held, 1. that the taking of judgment, under these circumstances, in the suit against *C* in *New-York*, operated as a surprise upon *C*, tantamount to a fraud, and justly called for the interposition of a court of equity, unless

prevented on the ground of some technical objection ; 2. that the " full faith and credit" required by the constitution of the *United States*, and the law of Congress, to be given to the judicial proceedings of other states, did not preclude such interposition, inasmuch as a court of equity here does not impugn the *New-York* judgment, but considers the equities subsisting between the parties, and acts upon them *personally*, restraining the one from pursuing a judgment so obtained, and protecting the other ; 3. that the record of the *New-York* judgment, finding, that the defendant " appeared, in his proper person, and said nothing in bar or preclusion of said action," does not necessarily conflict with the facts above stated, inasmuch as the plaintiff, in that suit, might, under the laws of *New-York*, have obtained a judgment and had a record made, like the judgment and record in question, without any *actual* appearance of the defendant.

The neglect of a corporation to perform some corporate duty, required by its charter—as to elect its officers annually—although sufficient to work a forfeiture of corporate rights; yet before such forfeiture is judicially determined, it cannot be taken advantage of collaterally.

*New-London,*
July, 1850.

Pearce
*v.*
Olney.

This was a bill in chancery, praying for an injunction against the further prosecution of an action at law.

At the term of the superior court, held in *September*, 1849, a committee were appointed to enquire into and report the facts alleged in the bill. That committee made their report substantially as follows: That the *Norwich Foundry Company* was duly organized, according to the laws of this state, as a joint stock corporation, for the purpose of carrying on the iron foundry business, in all its branches, and located and doing business at *Norwich* in this state ; that the plaintiff was a stockholder therein ; that at the time of the making of the contract with the defendant hereinafter mentioned, the plaintiff was, and ever since has been, employed by said company, as their general agent, and has acted as such, especially in the matters of buying, selling and manufacturing iron ; that on the 3d day of *July*, 1845, he was appointed secretary of said company, not having previously held that office ; that during the two years next preceding the month of *April*, 1845, said company had extensive dealings with the defendant, buying of him large quantities of iron for their foundry, which purchases were made by the plaintiff, in the name of, and as agent for, said company ; that on the 19th day of *April*, 1845, the defendant agreed with said company, through the plaintiff, as their said agent, (but not as their secretary, as stated in the bill,) to sell to said company fifty tons of No. 2. *Columbia* pig iron, as follows: 25 tons at $36\frac{50}{100}$ dollars per

ten, on a credit of six months from *May* 1st, 1845 ; and 25 tons, on a credit of six months from *June* 1st, 1845 ; which fifty tons of iron was, by the terms of said agreement, to be of a quality equal to certain iron bought of the defendant, by said company, prior to the 7th day of *December*, 1844, as *Columbia* pig iron, No. 2. and superior to certain other iron, bought, by said company, of the defendant, on said 7th day of *December*, 1844, as and for iron of that name ; and said company then agreed with the defendant, to buy of him said fifty tons of iron, of the quality and description aforesaid, for the price and on the terms aforesaid ; that subsequently, the defendant made out and sent to the said company, the ordinary mercantile bill of sale for said fifty tons No. 2. *Columbia* pig iron, but has never sent or delivered to said company, fifty tons of iron so bought of him by them as aforesaid, nor any part thereof.   But the committee find, that on or about the 9th day of *May,* 1845, the defendant shipped to said company five tons of iron as and for a part of said purchase of fifty tons, which said company, upon trial and examination thereof, found was not equal in quality to the iron previously bought, by said company, of the defendant, as *Columbia* pig iron, No. 2. but was altogether inferior thereto, and was in no wise superior to the iron bought by said company of the defendant, on said 7th day of *December*, 1844 ; nor was said five tons of iron suitable for the purposes for which said fifty tons were purchased, and was not such iron as said company bargained with the defendant to buy of him as aforesaid, but was of a quality far inferior thereto.   But whether the said iron was No. 2. *Columbia* pig iron, the committee are not satisfied, and do not find.

The committee further find, that on the 16th day of *May,* 1845, immediately after said company had examined and tried said five tons of iron, and found it thus different from, and inferior to, that which they had bargained for, as aforesaid, the plaintiff, as agent of said company, ordered the defendant not to ship the remaining forty-five tons, if similar to the aforesaid five, as said five tons was of a poorer quality than that which said company had bargained for, and was such iron as said company could not use : and so said company refused to accept and receive the same.   The committee find, however, that said company were always ready and

willing to accept, and receive, and pay for said fifty tons *Columbia* pig iron No. 2. of the quality above-mentioned, as bargained for and agreed upon, by them, with the defendant; but the defendant never delivered, or offered to deliver, the same, nor any part thereof, to said company, nor to the plaintiff.

New-London, July, 1850.

Pearce
*v.*
Olney.

The committee however find, that the defendant, on the 17th day of *June*, 1845, did offer to deliver to said company, in fulfillment of said agreement, on their part, forty-five tons of iron, of the same kind and quality as said five tons shipped and delivered as aforesaid, and always insisted, that said iron, so offered to be delivered, was such as had been bargained for, by said company; and that said company should accept and receive the same; and the only reason why the same was not delivered, was, that said company would not accept it, but ordered the defendant not to deliver it, for the cause above assigned.

The committee further find, that the plaintiff did not bargain for said iron, nor for any iron, of said *Olney*, the defendant, in his own name, or for his own private account, but only in the name and for the account, and as agent for, said foundry company; and that he did not, in any manner, pledge his private credit or responsibility for the performance of said contract with the defendant; all which was well known to the defendant.

The committee further find, that on the 1st of *February*, 1846, the defendant, by his attorney, commenced a suit against the plaintiff, returnable before the superior court, holden within and for the city of *New-York*, on the first *Monday* of *March*, 1846, and on or about said last-mentioned day, filed his declaration therein, containing divers counts, founded wholly on said contract made with said company, relative to said fifty tons of iron; in all which counts, however, and in all the proceedings thereon, said *Olney* falsely assumed said contract to have been made by said *Pearce*, individually, and on his own personal credit; whereas, in fact, it was made by said foundry company, and the credit of the said *Pearce* was in no wise pledged for the fulfillment thereof.

The committee find, that the said *Olney* commenced his said suit, by causing a writ of *capias* to be issued and served upon said *Pearce*, at the city of *New-York*, and duly returned

*New-London,*
*July, 1850.*

Pearce
*v.*
Olney.

to the superior court in and for said city; that before the session of the court to which said suit was returnable, and on the day next following the service of said *capias,* said *Pearce* called on said attorney, who had commenced, and who prosecuted said suit for said *Olney,* and informed him, that a mistake had been made in suing him individually, instead of said foundry company, and that said company was the proper defendant in the cause, and proposed to have the whole matter amicably adjusted; that said attorney thereupon agreed to see said *Olney,* in regard to the matter, and meet said *Pearce* again ; that subsequently, on the same day, said *Pearce* received from said attorney, at his, said *Pearce's* lodgings in *New-York,* a communication in writing, informing him, said *Pearce,* that he, said attorney, had called at said *Olney's* store, but did not find him ; and that nothing further should be done in relation to said suit, until said *Pearce* should receive further notice from him, said attorney. The committee find, that said *Pearce* did not receive any further notice from said attorney, nor from said *Olney,* nor from any other person, concerning the further prosecution of said suit ; and that, relying on said communication, so received by him from said attorney, he did not employ any counsel in the cause, and did not appear, by himself or attorney, before said court, to which said *capias* was returnable, but supposed and believed, that said suit was to be no further prosecuted against him. Said *Olney,* however, caused said *capias* to be returned to said superior court to which it was returnable, and said suit to be there further prosecuted, by said attorney ; and at the *April* term of said court, 1846, *viz.* on the 17th day of *April,* 1846, obtained judgment, before said court, against said *Pearce,* for the sum of 581 dollars, 7 cents, damages, and 31 dollars, 86 cents, costs of suit.

The committee find, that said judgment was rendered against said *Pearce,* without his knowledge or suspicion ; and that he was not aware of the fact that such judgment had been obtained, or said *capias* returned, until the 7th day of *November,* 1848, the day on which service was made upon him of the writ, in the suit upon said judgment, now pending in this court, against the prosecution of which said *Pearce* now prays this court to enjoin.

The committee further find, that if the facts aforesaid con-

stitute a good and legal defence to the suit in which said judg-
ment was rendered, by the superior court of the city of *New-*
*York*, said *Pearce* had a good and legal defence to said suit.

They further find, that said *Pearce* intended to appear in
said suit, and make said defence therein, and would have done
so, but for the communication received by him as aforesaid
from said *Olney's* attorney ; and so the committee find, that
said *Pearce*, without any fault on his part, was deprived of all
opportunity to make his defence in said suit.

The committee further find, that on the 7th day of *Novem-*
*ber*, 1848, said *Olney*, by *George Perkins*, Esq., his attorney,
brought his action of debt upon the judgment aforesaid,
against said *Pearce*, by writ duly issued and dated on the
1st day of *November*, 1848, and served on the said *Pearce*,
which said writ was returnable and duly returned to the su-
perior court, holden at *Norwich*, within and for the county of
*New-London*, on the third *Tuesday* of *March*, 1849, and is
still pending in said court, and prosecuted by said *Olney*, by
his said attorney, *George Perkins*, Esq.

The committee find, that said foundry company, on the 2d
day of *January*, 1841, made an election of directors, and
other annual officers, according to law ; but, from that time
until the third day of *July*, 1845, no election of directors of
said company took place, because at no time during that pe-
riod, was there a *quorum* of the stockholders of said company
together.   And the directors and other officers, so elected on
said 2d day of *January*, 1841, continued to hold and exercise
their respective offices until said 3d day of *July*, 1845, when
a new election of directors was made, by said company.

The committee also find, that said company did, annually,
in the month of *January*, in the years 1842, 1843, 1844, 1845
and 1846, make a certificate, containing the amount of their
capital actually paid in, the amount invested in real and per-
sonal estate, the amount of their debts and credits, at the time
of making such certificate, as nearly as the same could be as-
certained, with the name of each stockholder, and the number
of shares held by him, at the date of said certificate ; which
certificate was duly deposited with the town-clerk of the town
of *Norwich*.   But the committee find, that neither of said cer-
tificates, so made and deposited, by said company, was signed
by the president and secretary of said company, but each of

*New-London,*
*July, 1850.*

Pearce
*v.*
Olney.

them was signed, by *J. Huntington*, 2d, treasurer, and by him alone.

Against the acceptance of this report the defendant remonstrated, alleging certain matters, which the court found not to be true, and alleging further, that the present plaintiff *appeared* in said action against him in the superior court of the city of *New-York.*

As to the last-mentioned allegation, the court found, that the record of the judgment in that action, was as follows:

" City and County of *New-York.* ss :

*James N. Olney*, plaintiff in this suit, by *Edmund Terry,* his attorney, complains of *Abner T. Pearce*, defendant in this suit, who was served with process, by the name of *A. T. Pearce*, being in custody, &c. of a plea of trespass on the case upon promises.

For that whereas, &c.

" And it is suggested to the said court, now here, that the declaration in this suit has been duly filed with the clerk of this court, at the city-hall in the city of *New-York,* and that a copy of said declaration, and a notice requiring the defendant to plead thereto, within the time required by the rules of this court, were duly served on the said defendant, by posting the same in the office of the clerk of this court, according to the rules. And now, at this day, that is to say, on the first *Monday* of *April*, of *April* term, in the year one thousand eight hundred and forty-six, to which day the said defendant had leave to the declaration aforesaid to imparle, and then to answer the same before the justices of the said court, at the city-hall in the city of *New-York*, come as well the said plaintiff, by his attorney aforesaid, as the said defendant, in his proper person ; and the said defendant defends the wrong, and injury, when, &c., and says nothing in bar or preclusion of the said action ; whereby the said plaintiff remains therein undefended against the said defendant : therefore, the said plaintiff ought to recover against the said defendant his damages, by occasion of the non-performance of the premises and undertakings in the said declaration mentioned ; and as it is unknown to the said court what damages the said plaintiff has sustained, by reason of the premises, the sheriff of the city and county of *New-York* is commanded, that by the oath of twelve good and lawful men of the said city and county, he

diligently inquire what damages the said plaintiff has sustained," &c.

The court also found, that said record was in evidence before the committee, on the hearing of the parties in this case before them, and constituted evidence before them, in relation to said judgment, and the rendering thereof; and if said record was conclusive evidence, that the present plaintiff appeared in said action in which judgment was so rendered against him, and it was not competent for him, before said committee, to prove, by parol evidence, that he did not so appear in said action, then the court found that he did so appear in said action: but if said record was not so conclusive, and it was competent for the plaintiff to prove, by parol evidence, before said committee, that he did not appear in said action in which judgment was so rendered against him, then the court found, that he did not appear in said action.

The case was thereupon reserved for the advice of this court, upon the questions whether said record was conclusive evidence that the present plaintiff appeared in said action; and whether it was competent for him, before the committee, to prove, by parol evidence, that he did not appear in that action; and also as to what decree should be passed in this suit.

*E. Perkins,* for the plaintiff, contended, 1. That courts of chancery have power to enjoin against the prosecution of a judgment at law, when, by reason of any equitable circumstances of which such courts have cognizance, it is unconscientious for the judgment creditor to pursue it. 2 *Sto. Eq.* 194, 5. 2 *Sw. Dig.* 137. *Carrington* v. *Holabird,* 17 *Conn. R.* 537. *Mitf. Pl.* 131. *Floyd* v. *Jane* & al. 6 *Johns. Ch. R.* 479. *Countess of Gainsborough* v. *Gifford,* 2 *P. Wms.* 424. *Dilly* v. *Heckrotte* & al. 8 *Gill & Johns.* 170.

2. That courts of chancery exercise this power, not by virtue of any controul over the courts of law rendering the judgments, but solely by reason of their jurisdiction over the person of the party, seeking, against good conscience, to enforce such judgments, and over those equitable circumstances, which make it against conscience for him to do so. 2 *Sto. Eq.* 194. 2 *Sw. Dig.* 137. *Sheffield* v. *Duchess of Buckinghamshire,* 1 *Atk.* 630.

3. That though the judgment of a court in one state is, by the constitution of the *United States*, and the law of Congress, to have the same faith and credit in other states as in the state where it was rendered; yet it is to have *no more* faith and credit, and to stand upon *no higher* ground, than a domestic judgment. The fact, therefore, that the judgment in question was rendered by a court of the state of *New-York*, does not preclude the superior court of this state from enjoining against its prosecution, provided such court would enjoin against a domestic judgment, rendered under similar circumstances. Much less can this jurisdiction of our court be questioned, if by the law of *New-York*, a court of chancery in that state, could relieve against this judgment. *Winchester* v. *Jackson*, 3 *Haywood's R.* 313. 36. (*Am. Ch. Dig.* 19.) Now, the courts of chancery of *New-York*, possess this jurisdiction, and would enjoin against the judgment in question. *Floyl* v. *Jayne*, 6 *Johns. Chan. R.* 479. *Foster* & al. v. *Wood, Id.* 90. *Duncan* v. *Lyon*, 3 *Johns, Chan. R.* 356. *McDonald* v. *Neilson*, 2 *Cowen*, 193.

4. That the facts found by the committee require the exercise of this equitable power. They find, that *Pearce* did not owe *Olney* one dollar, and never had any dealings with him, in which his personal credit was involved; and that this *Olney* well knew, when he commenced his suit against *Pearce;* that *Pearce* had a good and perfect defence against that suit, which he intended to make, and was only prevented from doing so, by the written assurance of the attorney of *Olney*, that nothing further should be done in the cause, until he, *Pearce*, heard from him; and that he did not know or suspect, that the suit had been proceeded with, until two years afterwards, when he was sued, in this state, upon the judgment.

5. That the omission of the *Norwich Foundry Company*, to choose annual officers, and make annual returns, did not work a dissolution of the corporation. *Spencer* v. *Champion*, 9 *Conn. R.* 536. *Bethany* v. *Sperry*, 10 *Conn. R.* 201. *Kellogg* v. *Union Co.*, 12 *Conn. R.* 7.

6. That the record of this judgment, that the defendant, in that suit, appeared, in his proper person, is not conclusive against him, and does not preclude him, in this suit, from proving, by parol evidence, the fact, that he was not actually

present, and had no opportunity to defend.   In the first place, *New-London, July, 1850.*
if the record meant an actual appearance, instead of a mere
technical legal appearance, this evidence would be admissible.

Pearce
*v.*
Olney

It is not offered to show, that the judgment, as a proceeding
at law, is invalid or irregular, but simply to prove, that the
conduct of the party in obtaining it, was such, that he cannot
now conscientiously avail himself of it.   Every case in which
a court of chancery enjoins against a judgment, is made out,
by evidence that contradicts the record of the judgment, in
the same manner, and to the same extent, that this does.   To
reject this evidence would be to make the very success of the
fraud an invincible shield for its protection—to make even the
courts of justice the very instruments of fraud.   *Aldrich* v.
*Kinney,* 4 *Conn. R.* 380.   But secondly, by the law of *New-
York,* this record means nothing more than that technical
appearance, which is necessary to authorise the court to ren-
der judgment.   It is one of the fictions of law, like that by
which judgments are recorded as rendered on the first day of
the term, and is always explainable, when justice requires it.
*Van Schaick* v. *Trotter,* 6 *Cowen,* 599.   *Mann* v. *Carley,* 4
*Cowen,* 148.   *Vanderpool* v. *Wright,* 1 *Cowen,* 209.   *Em-
met* v. *Bradstreet,* 2 *Cowen,* 449.   *Ross* & al. v. *Hubble* &
al., 1 *Caines' R.* 512.   *De Wandelear* v. *Coomer,* 6 *Johns.
R.* 328.

   *G. Perkins,* for the defendant, contended, 1. That under
the constitution of the *United States,* requiring full faith and
credit to be given, in each state, to the public acts, records
and judicial proceedings of every other state, (*art.* 4. § 1, 2.)
and the acts of Congress, made in pursuance thereof, in an ac-
tion brought in one state, on a judgment rendered in another
state, the party may go behind the record for one purpose
only—and that is, to enquire whether the court rendering the
judgment, had jurisdiction of the cause and the parties; but
that where the party appeared, or had legal notice to appear,
the judgment is final and conclusive, and no enquiry can be
made into the merits thereof.   *Gleason* v. *Dodd.* admr. 4
*Metc.* 333. 337.   *Watson* v. *New-England Bank, Id.* 344.
*Hall* v. *Williams,* 6 *Pick.* 232. 241. & seq.   *Wood* & al. v.
*Watkinson* & al. 17 *Conn. R.* 500.   *Aldrich* v. *Kinney,* 4
*Conn. R.* 380. 383. & seq.

2. That if the facts showing jurisdiction, appear on the record, no evidence can be received to contradict them. Should those facts, by reason of mistake or otherwise, be untrue, the aggrieved party must resort to the authorities of the state where the judgment was rendered, for redress. *Hall* v. *Williams,* 6 *Pick.* 239, 240. and the other cases above cited.

3. That in the case before the court, *Pearce* unquestionably had *legal* notice ; and that is all that is necessary to give the court jurisdiction.

4. That if the plaintiff is not precluded, on this application, from showing facts inconsistent with the record, then there is no need of his coming here ; for he may show those facts on the trial of the pending action of debt on judgment. There is nothing in the way of his setting them up as a defence to the action at law, but the record of the *New-York* court ; and the protection of *that,* if not available in chancery, is not at law. The obligation of " faith and credit," will not press more weightily upon the latter court than the former. Why should the same court, acting under the same constitution and laws, be more fastidious in suffering a party to go behind the record of a sister state, in one capacity than another ?

5. That in either of the alternatives presented, a court of chancery will not exercise the extraordinary power sought by the bill.

HINMAN, J. The object of injunctions to stay proceedings at law, is, to prevent injustice, by an unfair use of the process of a court. They are granted on the ground of the existence of facts, not amounting to a defence to the proceeding enjoined against, but of which courts of equity have jurisdiction, and which renders it against conscience that the party enjoined should be permitted to proceed in the cause. It is well settled, that this jurisdiction will be exercised, whenever a party, having a good defence to an action at law, has had no opportunity to make it, or has been prevented, by the fraud or improper management of the other party, from making it, and by reason thereof, a judgment has been obtained, which it is against conscience to enforce. Indeed, this falls directly within, and is but an illustration of, the general rule, that equity will interfere to restrain the use of an advantage gained

in a court of ordinary jurisdiction, which must necessarily make that court an instrument of injustice, in all cases where such advantage has been gained, by the fraud, accident or mistake, of the opposite party.

The application of these principles to the facts in this case, is obvious. A suit was commenced in *New-York*, against the present plaintiff, by virtue of which, and of the process thereon, he was arrested, and such proceedings were had, that a judgment for about six hundred dollars was obtained against him, on a cause of action founded wholly on a contract, with which, personally, he had nothing to do; but was entered into by him, as the agent of the *Norwich Foundry Company*, a corporation with which the plaintiff in that suit had had previous dealings, and was well known to him, at the time, as the party with whom he was contracting. If this was all, the plaintiff would have no remedy, however unjust it might be, to compel him to pay that judgment. Still, as he was duly served with process in that suit, it was his duty to make defence in it; and an injunction ought not to be granted to relieve him from the consequences of his own neglect.

It is found, however, that he not only had a good defence, but it was his intention to make it; and he would have made it, had he not been led, by the conduct of the attorney of the plaintiff in that suit, to suppose that the suit was abandoned. Very soon after the suit was instituted, the present plaintiff, then defendant, called on the attorney, and explained to him the circumstances under which the contract was made, and the mistake in suing him individually, instead of the company for whom he acted; and when they parted, the attorney said, he would see the defendant again on the subject. This he did not do; but shortly after, wrote him a letter, notifying and informing him, that nothing further would be done in relation to that suit, until some further notice should be given him. This, though not an abandonment of the suit, at the time, yet coming from the attorney of the plaintiff, after the information communicated to him, by the defendant, was an assurance on which it was very natural to rely; and, after waiting a reasonable time, and receiving no further notice on the subject, we think he had a right to suppose the demand, as against him, personally, was given up and abandoned. And it seems quite obvious, that the taking of judgment in

that case, without any intimation of an intention to do so, or any further notice in relation to the suit, or the subject matter of it, must operate as a surprise upon the defendant, which is tantamount to a fraud, and justly calls for the interposition of a court of equity. Indeed, that such is the result to which the bill and the facts found, by the committee, necessarily lead, is hardly questioned; unless it is prevented, on the ground taken in some one or more of the technical objections, which have been suggested in the argument.

It is insisted, that under the constitution of the *United States,* requiring full faith and credit to be given to the judicial proceedings of other states, it is not competent to the court to impeach the judgment of the superior court of *New-York ;* it being shown, that that court had jurisdiction of the cause, by the regular service of process on the defendant in that suit. And cases are cited to sustain this position. This doctrine is correct enough, no doubt, properly understood and applied; but it has no application here. There is no attempt to impeach the validity of the *New-York* judgment. In granting an injunction against proceedings at law, whether in a foreign or domestic court, there is no difference; the court of equity does not presume to direct or controul the court of law; but it considers the equities between the parties, and acts upon the person, and restrains him from instituting or prosecuting an action. 2 *Sto. Eq.* § 875.

These are well settled principles; and, in view of them, the only question in the case, must be, whether the circumstances are such as to require of the court, that the defendant should be restrained from pursuing a judgment which he has obtained, in the manner in which he procured this, in *New-York.*

It is further claimed, that the corporation for which the plaintiff acted, in the making of the contract, on which the case in *New-York* was founded, had ceased to exist; and, as there was no principal to be bound by the acts of the agent, that the plaintiff was himself personally liable, although he professedly acted as agent of another.

There is no foundation for this claim. The finding of the committee, indeed, shows, that the corporation failed to elect a board of directors, annually, as they should have done; and that, after *January,* 1841, there was no subsequent election,

until 1845; the board elected in 1841, in the mean time, acting until the election in 1845: and that the certificates required, from time to time, to be deposited with the town-clerk, were signed by the treasurer, instead of the president and secretary, as they should have been. But this court has repeatedly decided, that the neglect of a corporation to perform some corporate duty required by their charter, although sufficient to produce a forfeiture of corporate rights; yet, before such forfeiture is judicially determined, it cannot be taken advantage of collaterally. *Derby Turnpike Co.* v. *Parks,* 9 *Conn. R.* 522. 536. *Kellogg* v. *Union Co.* 12 *Conn. R.* 7.

Again, it is claimed, that the record of the judgment rendered in *New-York,* shows, that the defendant in that suit, appeared, and was in fact present in court, at the time judgment was rendered against him; and as it is an agreed fact, that he was duly served with process, it is insisted, that this record of the defendant's appearance, is conclusive; and that no evidence can, properly, be admitted to contradict the record, in this respect, without directly impugning the full faith and credit which is due to the record.

What force there might be in this objection, if the appearance mentioned in the record necessarily meant, that the defendant in that suit was actually present in court, when said judgment was rendered, and said " nothing in bar or preclusion of said action," it is unnecessary to determine. We are satisfied, that no such meaning can be given to the record of the defendant's appearance in that case.

By the statutes of *New-York,* as they existed at the time this judgment was rendered, it was provided, that " upon the service of a *capias ad respondendum* upon any person, which does not require the defendant to be held to bail, he may indorse his appearance on such writ, or if he refuse to do so, the sheriff may return the writ personally served. And upon such writ being returned, with the appearance of a defendant indorsed, or, of his having been personally served, the clerk of the court shall enter the appearance of the defendant, upon whom the same was served; and thereafter, proceedings may be had against such defendant, as if he had actually appeared. 2 *Rev. Stat.* of *N. Y. part* 3. *chap.* 6. *p.* 347, 8.

Under this statute, it was obviously competent for the

plaintiff in that suit, to have obtained his judgment in *New-York,* without the appearance of the party, defendant, in person; and yet, the record would be the same as if there had been an appearance in fact; because it is made the duty of the clerk, under the circumstances mentioned in the statute, to enter the appearance; and it is there provided, that the same proceedings may be had, as if there had been an actual appearance.

It was, without doubt, under this statute, that that judgment was obtained; because it is found, by the superior court, that the plaintiff did not appear in said action, unless, indeed, the record is conclusive evidence to the contrary. But a record is never conclusive evidence of a fact, which is either not true, or which is as probably false as true. It is, no doubt, a rule in *New-York* as in *England,* that there must be an appearance, in order to obtain a judgment. This appearance, however, in very many cases, is a mere fiction, provided for by statute, in order to avoid the effect of a technical rule; and should not be permitted to work injustice, contrary to the truth of the fact. It was formerly a fiction of law, that all judgments were rendered on the first day of the term; but, in practice, they very seldom were so in fact. And in *England,* they are frequently signed in vacation; and it has always been held, where the purposes of justice require it, that the true time of obtaining judgment, may be shown.

Upon the whole, then, we are satisfied, that none of the objections of the defendant, in this application, ought to prevail.

We, therefore, advise the superior court, to grant a perpetual injunction against the defendant's further prosecuting his action of debt on the judgment recovered in *New-York.*

In this opinion the other judges concurred.

Perpetual injunction granted.