MAURICE F. McAULIFFE ET AL. *v.* THE RUSSIAN GREEK
CATHOLIC CHURCH OF SAINT JOHN THE BAPTIST ET AL.

MALTBIE, C. J., BROWN, JENNINGS, ELLS and DICKENSON, Js.

Argued April 13, 1943—decided February 3, 1944.

Samuel Reich and Philip Reich, with whom was George Ferrio, Jr., for the appellants (defendants).

James C. Shannon, Allan E. Brosmith, and Thomas F. Garrahan (of the Pennsylvania bar), with whom, on the brief, was Hugh J. Lavery, for the appellees (plaintiffs).

ELLS, J. In the decade beginning with the year 1890 a considerable body of immigrants known as Ruthenians or Carpatho-Russians settled in the east side of Bridgeport. They were Slavs, spoke a dialect of the Russian language and came from the territory known as Podkarpatska Rus, which lay on the southern slope of the Carpathian Mountains in what was then Hungary. A deeply religious people, they proceeded in the year 1900 to establish a church of their own in Bridgeport. The congregation grew rapidly and the church now occupies a large and valuable edifice. Two services are held each Sunday and the average total attendance is about fifteen hundred. Disputes which began in 1932 have now developed into a controversy concerning the legal title to the church property and to a school building, and particularly as to whether the title is held for the uses of a Roman Catholic church of the Greek Ruthenian rite, that is, a Greek Catholic church united with Rome, or for the uses of an independent autonomous Greek Catholic church.

On September 2, 1900, sixty-four persons, practically all of whom were Ruthenians or Carpatho-Russians, met in Sadler's Hall in East Bridgeport and organized the Greek Catholic Church Society of St. Elias the Prophet. No priest was present. Officers were elected and at a later meeting by-laws were adopted. One of them provided that "This Society shall take care of its Greek Catholic Faith and its Greek Catholic Church, at Bridgeport, Connecticut. Each and every faithful Greek Catholic in whose heart lies his paternal and maternal Greek Catholic Faith can become a member of this Society." Arrangements were made with the priest of the Hungarian Greek Catholic uniate church on the west side of Bridgeport to say mass for the Ruthenians in St. Michael's Roman Catholic Church

in East Bridgeport. In April, 1901, Father Volkay, a priest in union with Rome, became their pastor and held services in a store. He was succeeded in 1904 by Father Dudinsky, a uniate priest. On May 8, 1904, the society by vote changed its name to the Greek Catholic Church of St. John the Baptist. The membership of this society constituted the membership of the church. The society purchased land on Arctic Street on May 16, 1904, and took title in the name of three trustees, with habendum to their successors and assigns forever. At a meeting of the society just prior to the acquisition of this land, it was voted, one hundred and six to three, "that in the event that we have a church" it should be "under a Bishop." Late in 1904 Father Gojdics, also a uniate priest, became pastor and was the first to devote his entire time to the society. He proceeded to conduct services for the society in the basement of a neighboring Roman Catholic church of the Latin rite. Early in 1905, at a meeting of the society held in the basement of this church, it was decided to build a church on the Arctic Street property.

On December 5, 1905, the plaintiff corporation was incorporated as the St. John Baptist Church by the execution of a certificate of organization signed by Michael Tierney, bishop of Hartford, John Synott, vicar general, Elias Gojdics, pastor, and two laymen of the church, certifying that they had organized a corporation under the provisions of the statute laws of Connecticut governing the organization of Roman Catholic churches, and this certificate was duly filed with the secretary of state. The society never voted to incorporate itself, but impliedly and tacitly acquiesced in and approved the incorporation and organization of the St. John Baptist Church. The trustees then conveyed the Arctic Street land to the corpora-

tion. No vote of the society was ever taken to expressly authorize this conveyance. In 1906 a basement church was built, following a loan by a bank, secured by a mortgage deed in which the corporation was described as the St. John Baptist Church, an ecclesiastical corporation of the Roman Catholic church. In 1908 Father Staurovsky became pastor and remained until 1911, when Father Chornock arrived. Both were uniate priests. In 1913 it was decided by vote of the parish to build the superstructure of the church and a rectory. A mortgage loan was secured, the deed describing the grantor as an ecclesiastical corporation of the Roman Catholic church, the buildings were erected and the church was dedicated in 1914. In 1915 the church society formed itself into a cemetery association and purchased land for such use. In 1920 the corporation acquired land on Pembroke Street, a mortgage loan was secured from a bank and a school building was erected. In 1925 the school building was dedicated. In 1930 serious trouble arose and Father Chornock was ultimately excommunicated from the Catholic church by Rome. He was supported by the overwhelming majority of the congregation and a resolution was adopted empowering him to hire legal counsel. It was later voted that nine trustees be elected and that Father Chornock and two laymen, the then members of the corporation other than the bishop of Hartford and his vicar general, sign deeds for the property to the nine trustees. This was done. Thereupon the defendant The Russian Greek Catholic Church of St. John the Baptist was organized in accordance with the provisions of Chapter 195 of the General Statutes, and the certificate of organization was duly filed with the secretary of state. The trustees then deeded the property to this corporation.

In 1938 the Reverend Daniel Maczkov, a regularly

ordained priest of the Roman Catholic church of the Greek Ruthenian rite, was appointed pastor, but Father Chornock and his adherents, in possession and control of the property, have refused to relinquish it and to recognize the appointment of Father Maczkov. Maurice F. McAuliffe, Roman Catholic bishop of Hartford and president and trustee of the original corporation, the corporation itself, Father Maczkov and two members of the original society who adhere to the Roman Catholic church and represent the members who likewise adhere brought this action against the new corporation, which claims to be an independent and autonomous Greek Catholic church, against the new society, which is incorporated, against various individuals, as representing different societies and as trustees in various capacities, and against Father Chornock.

The foregoing are the highlights in the chronology of events. The record contains two thousand four hundred and forty-five printed pages; there are six hundred and thirteen paragraphs in the finding of facts made by the trial court; and the scholarly memorandum of decision is thirty-nine pages in length. However, the questions to be decided are few in number. The court decided that the corporation held nothing but the bare legal title and held such title for the uses and purposes of the society, which continued to exist as the church—that is, for the uses and purposes of the church maintained by the voluntary association as it was at the time the title became vested in the corporation, no matter what denomination that might be, because equity will not permit a religious trust to fail for lack of a trustee; that if it should be found that the society is an independent and autonomous church equity would simply appoint another trustee and would not let the trust fail; and that when a trust is

once established for any particular religious or charitable use it remains for that use forever and to no other use whatever. General Statutes, Rev. 1930, § 5000.

The rule is well-recognized that the title to church property of a divided congregation is in that part of it which is acting in harmony with its own law, and the ecclesiastical laws, usages, customs and principles which were accepted among it before the dispute began. *Russian Orthodox Greek Catholic All Saints Church* v. *Kedrovsky*, 113 Conn. 696, 704, 156 Atl. 688. The opinion of Lord Eldon in *Attorney-General* v. *Pearson*, 3 Mer. 353, 400, 36 Eng. Rep. R. 135, is often cited to the effect that it is the duty of the court to decide in favor of those, whether a minority or a majority of the congregation, who are adhering to the doctrine professed by the congregation and the form of worship in practice, as also in favor of the government of the church in operation with which it was connected at the time the trust was declared. *Greek Catholic Church* v. *Orthodox Greek Church*, 195 Pa. 425, 434, 46 Atl. 72; *St. Michael's Ukrainian Greek Catholic Church* v. *Bohachewsky*, 60 R. I. 1, 20, 196 Atl. 796.

The plaintiffs and the defendants, in their briefs and in oral argument, and the trial court, in its memorandum of decision, considered the controlling question to be whether the founders of the church intended that it should be subservient to Rome or independent of Rome. The society was definitely formed in 1900 to carry on religious ceremonies. The land for the church was purchased in 1904, and our Statute of Charitable Uses, General Statutes, § 5000, fixed its then character for all time. Under the statute there can be no essential change as to the uses of the land acquired after the time of the acquisition. The school property was not acquired until 1920, and its character would be

fixed as of that date. If the church was not uniate at its foundation, there would have to be a definite finding, as one of fact, that thereafter it changed its character, and there is no such finding. The controlling questions are, then, the purpose for which the church was founded in 1900 and the uses for which title to the church land was held in 1904. Upon these questions subsequent facts are also relevant, but they lose weight as they become remote from the above dates.

We consider first the purposes which the founders expressed in their articles of association. "Church paragraphs," meaning by-laws, were set up. In several particulars they provide for procedures which are not customary in a Roman Catholic church. The really significant feature of the paragraphs, however, is that the purpose of the society is to take care of its "Greek Catholic Faith and its Greek Catholic Church," that its members shall be those "in whose heart lies his paternal and maternal Greek Catholic faith." Their plain intention was to organize a church dedicated to the Greek Catholic faith of their fathers and mothers. The evidence as to what this faith was is voluminous and conflicting. The court reviewed the ecclesiastical history of the regions from which the founders came from their conversion to Christianity about 865 A.D. to 1900 and made complete findings of fact. We mention only the more important ones, relating to modern times. In many of the towns in Podkarpatska Rus from which these people came there were two churches, one in which services were conducted according to the Roman Catholic Latin rite, and the other, in accordance with the Roman Catholic Greek or Byzantine rite. There are marked differences between the two churches, one being that in the latter there are no statutes as there are in the former. By the laws of the Hungarian government the term "Greek Catholic"

meant those who were united with Rome. In the latter part of the nineteenth century the population of Podkarpatska Rus consisted almost exclusively of Greek Catholics in union with Rome. The people loved their Greek Catholic church and knew the traditional history of it. They knew their church was affiliated with Rome, and that the Pope at Rome was the visible head of their church. They were content to have it so as long as they were permitted to worship in the manner of the Greek Catholic liturgy and to have their sacraments administered in accordance with the Greek Catholic rite. It is from this background that the early members of the St. Elias Society came. The court concluded that the paternal and maternal faith was a Greek Catholic church in union with Rome; that from that fact it may well be inferred, unless there be substantial evidence to the contrary, that the intention was to form a church of the denomination to which they belonged. A careful review of the evidence assures us that the court could reasonably reach this conclusion.

There is a second significant line of evidence from which the court found that practically all of the sixty-four founders were actually Greek Catholics united with Rome, and that the rest were either Roman Catholics or felt that they were because of their marriages and previous attendance at Roman Catholic churches. These findings also have been vigorously attacked. They are based upon evidence, are reasonably found and must stand.

The third line of evidence which has a vital bearing upon the questions to be decided concerns the acts of the group from the time of their organization down to the times of the creation of the trusts, together with whatever light may be cast by their acts thereafter; that is, how they and their successors conducted the

church after it was established. This is perhaps the most strongly contested feature of the case. An extended summary of the evidence which concerns this question alone would obviously be impracticable; therefore we must limit our discussion to the points we consider to be the decisive ones. It is at once apparent, upon the evidence, that the society did many things which, under the canon law governing the Roman Catholic church of the Greek Ruthenian rite, were irregular. These acts may indicate a conclusion that, in general, all through its history this church has managed its own business affairs by vote of the society. The society has been in control rather than the priest and the bishop, and to an extent which would not be tolerated in an ordinary Roman Catholic church. Various instances of self-government and, indeed, the settled course of administration are indicative of an independent church. The significance of the acts of self-governance is weakened, however, when it is borne in mind that when the church was organized and while the modes of procedure were being established the Greek Ruthenian rite of the Catholic church as such was not yet functioning in this country, which was still regarded as a missionary field. The founders were strangers in a foreign land. The bishop of Connecticut was of the Latin rite; they were of the Ruthenian rite. There were differences in language, in liturgy and in other forms of worship. At least until their own bishop came to this country it is to be expected that they would act in many respects in an uncanonical and irregular way. Apparently both the bishops and they were content to let matters run along as they were so long as in fundamentals they remained Greek Catholics united with Rome and under the jurisdiction of Roman bishops of the Latin rite. The same considerations as to language and ritual would

account for similar results even after their own bishop came, but to a lesser extent. All these facts and inferences from facts were reasonably found by the trial court and are reasonably supported by evidence. The court also found many important facts which, standing alone, would warrant a judgment for the defendants, but these facts must necessarily be considered and weighed together with a great mass of facts pointing strongly to union with Rome rather than independence. Again it must be stated that considerations of space necessitate a summarized statement of the acts of conformity found by the court. The trial court constructed a balance sheet, setting down on one side the acts indicative of independence from Rome and on the other side those pointing to union with Rome; then it evaluated these various factors.

In the latter class are the following: (1) In the very beginning the founders voted, one hundred and six to three, that the proposed church should be under a bishop. There was then no Greek uniate bishop, and, especially in view of subsequent events, the court considered that the vote indicated a clear intent to come under the jurisdiction of the Roman Catholic bishop and that the church should not be a lone, independent church. (2) The corporation which took the bare legal title was Roman Catholic. Although the society did not actually vote to place the title there, the court found acquiescence and ratification in various respects. (3) The priests of the parish have always been uniate priests. (4) From the very beginning down until after the school was built, at least, the masses said have been the liturgy of the uniate church. In this mass three prayers are offered for the Pope of Rome, naming him. (5) Aside from the fact that the title stood in the name of a Roman Catholic corporation, the members of the church knew that various mortgages, in

large sums, were approved by the bishop of Hartford or by uniate bishops or administrators. The mortgage deeds described the mortgagor as an ecclesiastical corporation of the Roman Catholic church, and were duly authorized at meetings of the congregation. (6) The ceremony of the dedication of the basement church in 1906 was conducted by a Roman Catholic monsignor from Hartford; the superstructure of the church was blessed in 1914 and the school building was dedicated in 1925 by uniate bishops referred to in the minutes as "our bishop." (7) The church regularly paid cathedraticum, which is an assessment made on each local Catholic church for the expenses of the diocese. Payment of it is an indication that the local church is subject to the jurisdiction of the bishop and owes allegiance to him. The fact that it was paid was reported at the time to the church meetings. (8) The same is true as to Peter's pence. (9) In 1915 the church society formed itself into a cemetery association which purchased land for a cemetery. A by-law states that those "who do not recognize the Pope as the visible head of Christ's Church shall have no right whatever to be interred in said cemetery, even if the person had a lot in said Cemetery." (10) In culmination of the trouble which began in 1930, the church ratified a resolution which had been adopted by the Greek Catholic Union, a national organization, reciting that, if Rome did not accede to the demands then stated, ". . . we, all the people, together with our churches and the clergy, shall break relations with the Roman See for so long a time as our demands are not acknowledged, that is, we shall become independent from Rome." Rome did not yield, and the break occurred. The trial court aptly said: "It can indicate only one thing, namely, that up to the time of its adoption the church was, and recognized itself to be, united with Rome. . . .

If the church had not been dependent upon Rome it could not very well 'become' independent from it." The court then concluded as follows:

"Without going further into details, the whole course of conduct of the St. Elias Society, later known as The Greek Catholic Church of St. John the Baptist, shows clearly that it was founded as a Greek Catholic Church united with Rome, and that it remained such during the whole course of its existence down to 1933. It was the intention of the members of that church that it should be what is known in this country as a Roman Catholic Church of the Greek Ruthenian Rite. From 1907 on, they had their disputes and quarrels with the Greek Ruthenian bishops, and that may have had some bearing on the fact that they did not conduct their affairs strictly in accordance with the canonical laws governing the diocese. But they always recognized that they were a part of the diocese and that they were under the jurisdiction of the Church of Rome and the Roman Catholic bishops."

"That was the situation, in all events, at the time when the church acquired all of its real estate and turned the title thereto over to the Roman Catholic corporation known as The St. John Baptist Church. From that it follows that that corporation must hold the title for the uses and purposes of the Roman Catholic Church of the Greek Ruthenian Rite. Rev. Daniel P. Maczkov is the duly accredited representative of that church in Bridgeport, and possession of the premises should be turned over to him."

If the findings and conclusions of the trial court stand, we have this situation: A group of Greek Catholics united with Rome, attending Roman Catholic churches in Bridgeport, organized a church society to take care of its Greek Catholic faith and its Greek Catholic church, its membership to be faithful Greek

Catholics in whose heart lay their paternal and maternal Greek Catholic faith. These people came from Hungary, by whose laws the term "Greek Catholic" meant those who were united with Rome. Their fathers and mothers belonged to a church united with Rome. At first the founders had no settled priest. Except in one explainable situation, services were conducted for them in a Roman Catholic church, and in a store, by uniate priests using the prescribed liturgy and ceremonials of the Greek Catholic church united with Rome. They voted that if they had a church of their own it should be under a bishop, an action which under the circumstances then existing could reasonably mean only a Greek Catholic bishop united with Rome or the Roman Catholic bishop of Hartford. They bought the Arctic Street property on May 16, 1904. In December of that year Father Gojdics came, their first full-time priest. He had made arrangements to conduct services for the society in accordance with the liturgy and ceremonials of the Greek Catholic church united with Rome, and did so conduct them, in the basement of a neighboring Roman Catholic church. Prior to the vote to build a church he informed the members that he was preparing a charter to incorporate the society so that it could hold the legal title under the bishop of Hartford. This was done. They acquiesced. Once, when the question of where the title was came up for discussion, they voted unanimously that they were satisfied. Such was the situation during the crucial time under consideration. Findings of fact as to the conduct of the church subsequent to this period, hereinbefore summarized, support the court's conclusion that the church remained essentially the same down to 1933.

It is a familiar rule in this state that this court will not change findings of fact made by the trial court

which are reasonably supported by evidence. We conclude that we cannot change the finding in respects vital enough to alter the result. There was evidence to support the facts found by the trier.

The dissension which began in this church in 1930 was not of mere local character but was widespread. Questions somewhat similar to those involved in the present case have been decided in various state courts. We do not attempt to evaluate the worth of these decisions or to apply them to the instant case, for their facts are different in important particulars. For example, the decision in the case of *Malanchuk* v. *St. Mary's Greek Catholic Church of McKees Rocks,* 336 Pa. 385, 9 Atl. (2d) 350, principally relied upon by the defendants, is based upon facts which differ widely from the facts of the instant case. There was evidence to support the facts found by the trier, and the court (p. 396) quoted from *Glenn* v. *Trees,* 276 Pa. 165, 168, 120 Atl. 109, as follows: ". . . juries and judges of the lower courts, as tryers of facts, must assume full responsibility in finally determining matters submitted through the evidence for their consideration, leaving to the appellate courts the duty of correcting such errors of law or procedure as may appear in the record." The similar case of *Moneta* v. *Varnak,* 339 Pa. 479, 15 Atl. (2d) 350, was decided, and briefly, upon this basis. The real difference between the parties is more over what deductions are properly to be drawn from the conflicting testimony than over what is the correct law applicable to the facts. For that reason, as we have already said, the reported cases are not of controlling significance. We cite them as being in the nature of legal bibliography and in alphabetical order, without regard to their date or decision. *Canovaro* v. *Brothers of Order of Hermits of St. Augustine,* 326 Pa. 76, 191 Atl. 140; *Chrapko* v. *Kobasa,* 271 Pa. 447, 114 Atl. 254; *Drozda*

v. *Bassos*, 260 App. Div. 408, 23 N. Y. S. (2d) 544; *Greek Catholic Church* v. *Orthodox Greek Church*, 195 Pa. 425, 46 Atl. 72; *Morris* v. *Featro*, 340 Pa. 354, 17 Atl. (2d) 403; *St. John the Baptist Greek Catholic Church of Perth Amboy* v. *Gengor*, 118 N. J. Eq. 467, 180 Atl. 379, 121 N. J. Eq. 349, 189 Atl. 113; *St. John The Baptist Russian Orthodox Greek Catholic Church* v. *Fenno*, 312 Pa. 46, 167 Atl. 330; *St. Michael's Ukrainian Greek Catholic Church* v. *Bohachewsky*, 60 R. I. 1, 196 Atl. 796. These appear to be the more important cases. Many of them contain further citations.

The church was founded as a uniate church and continued to be such for thirty years until Father Chornock's dispute with Rome arose when he, admittedly a uniate priest, became Orthodox and independent, and carried the great majority of the congregation with him. The dispute which we are deciding has nothing to do with freedom of religion. The question concerns only the right to occupy and control property. The church claimed and received the protection, benefit and assistance of the Roman Catholic church in Connecticut, its basic faith and its laws. After having claimed life from that church for thirty years, and the benefit of the faith that it follows, with the protection granted under its laws, the church cannot suddenly repudiate its allegiance to the body under which it serves. Its practices deny it such right, at least in so far as its property is concerned. This congregation, and any part of it, may change its faith at will but may not possess and control this particular property. The determinative factor is the status of the church before the dispute began, not after. *Russian Orthodox Greek Catholic All Saints Church* v. *Kedrovsky*, 113 Conn. 696, 704, 156 Atl. 688.

The defendants have raised two technical but sub-

stantial questions of law concerning the actual title to the property. They contest the validity of the incorporation of the St. John Baptist Church, claiming that one of the two laymen who signed the certificate of organization was induced to do so upon the fraudulent representation of Father Gojdics as to the purport of the certificate, and that this layman did not know or understand what he was signing. There is evidence reasonably supporting the court's conclusion that there was no fraud and that the layman had knowledge of the character of the instrument sufficient to make his act binding upon him. The incorporation was effectively accomplished. No by-laws were ever adopted and no minutes of meetings have been kept. The corporation was, however, at least a de facto corporation and as such its valid existence as a corporation may not be attacked collaterally, as it is in these proceedings. *Pearce* v. *Olney,* 20 Conn. 544, 556; *DiFrancesco* v. *Kennedy,* 114 Conn. 681, 687, 160 Atl. 72; 2 Cook, Corporations (8th Ed.), § 637, p. 2345.

A more serious claim is that the corporation did not acquire valid title, either legal or equitable, to the church land because the trustees who purported to convey it were not expressly authorized to do so by vote of the society for which they held title in trust. The Pembroke Street or school property was conveyed directly by the original owners to the corporation. We have already stated at length the circumstances surrounding the acquisition of the Arctic Street property by the trustees and their conveyance to the corporation. Notwithstanding the lack of a specific vote by the society expressly authorizing the transfer to the corporation, it can hardly be claimed that the trustees did not acquire title for the uses and purposes of the society or that they did not hold it for those uses, for themselves and their successor trustees. The religious

purposes for which the property was acquired were those for which the society existed at the time the trust was created. The court concluded that the uses and purposes for which the property was acquired and for which it has been held are those of a Roman Catholic church of the Greek Ruthenian rite and not those of an independent church. The St. Elias Society was an ordinary voluntary association, not a statutory ecclesiastical corporation organized under General Statutes, § 3542. It could not hold real estate. *Russian Orthodox Greek Catholic All Saints Church* v. *Kedrovsky, supra,* 698. When it was decided to build a church on the property, involving also the securing of a large mortgage, the question of an entity to hold the title, in trust, and to execute the mortgage became important. It was at a meeting of the society held in the basement of a neighboring Roman Catholic church on March 26, 1905, that the members decided to build a church. Prior thereto their priest, Father Gojdics, had informed them, at a meeting of the society, that he was preparing a charter to incorporate the society and that the purpose in so doing was to provide an entity to hold the title under the "Hartford Bishop," meaning the Roman Catholic bishop of the Latin rite. The society knew that a corporation was being formed for this purpose. The court expressly found that it acquiesced. General acquiescence appears, from the facts found, throughout the subsequent events. Specific acquiescence appears in the finding that, although the question of "where the title was" came up at later meetings of the society, it was voted unanimously that the members were satisfied to leave the title as it was, it being recognized and approved by them that all church property was to be managed in accordance with the "Statutes of the Latin Bishop," meaning the

Roman Catholic bishop of Hartford. A significant fact was the intent of the individual members of the society to submit their interests in the property to the authority of the Hartford bishop. The trustees could convey the title they possessed, which was in trust for the uses of the society. It is also to be remembered that it was the society which functioned throughout, both to transact the ordinary church business and to manage the secular affairs of the parish. The membership of the society constituted the membership of the church.

Another highly significant act is the manner in which the mortgages were executed. In 1906 a basement church was erected, the construction of which was left in the hands and under the control of Father Gojdics and a committee elected by the society. The edifice was dedicated by the vicar general of the diocese of Hartford. A mortgage for $11,000 was executed by The St. John Baptist Church, an ecclesiastical corporation of the Roman Catholic church, acting by Father Gojdics and others. The corporation had authorized it by a resolution in writing, naming Father Gojdics as the agent to execute it. In 1913 it was decided by vote of the society to build the superstructure and a rectory. Father Chornock was then the pastor. He secured the verbal approval of the bishop of Hartford and the consent of Bishop Ortynski, who was sent to this country by the Pope as bishop of the Ruthenian rite in 1907 and who became a full bishop in 1912. Parenthetically, it should be stated that all priests subsequent to Father Gojdics were appointed by Bishop Ortynski and were approved by the Roman Catholic bishops of Hartford. It was necessary to borrow money by mortgage to pay for the superstructure. At a meeting of the congregation held February 9, 1913, it was reported to the meeting that Bishop Nilan, the

Hartford bishop, did not want to sign the approval of the mortgage because Bishop Ortynski had been given full powers as an ordinary or bishop over all of the Greek Ruthenian rite churches in this country. It was voted "that a committee be selected from the congregation to go to the Bishop of Hartford and ask him in a nice way to do that, that is, sign the mortgage, and that he keep us beside him until such time as we shall have order here with our Bishop." The court thus found that "The members of said congregation at this time recognized that they were a part of the Roman Catholic Church, but they preferred to be under Bishop Nilan rather than Bishop Ortynski, and said committee was appointed and met Bishop Nilan, the Bishop of Hartford, and reported back to the congregation that the Bishop of Hartford felt that they should secure the approval of their own Bishop, Bishop Ortynski, which they did." On March 3, 1913, the corporation, described as an ecclesiastical corporation of the Roman Catholic church, acting therein by Orestes P. Chornock, its agent duly authorized, mortgaged the property for $40,000. The deed and note were approved in writing by Bishop Ortynski, at the request of the congregation.

There was evidence reasonably supporting these findings, and they must stand. They show quite conclusively that the original informalities in title were cured by direct ratification, that the society or congregation knew the state of the title and that it was held in trust for the purposes of a Greek Catholic church of the Ruthenian rite, united with Rome.

Exceptions were taken to various rulings on evidence. The defendants stated in oral argument that they did not rely on them as ground for reversal. Therefore we do not discuss them.

There is no error.

In this opinion BROWN, JENNINGS and DICKENSON, Js., concurred.

MALTBIE, C. J. (dissenting). A long study of the record and evidence in this case has left me with the conviction that the trial court erred in findings and conclusions vital to its ultimate decision, and I am unable to agree with the foregoing opinion. I refrain from stating my reasons only because to do so would require a discussion so lengthy that there seems no adequate justification for making it a part of our reports.