On application of the plaintiff, who shall hereinafter be referred to as the bishop, acting individually and as bishop of the Carpatho-Russian Orthodox Greek Catholic Church of North and South America, a temporary injunction was issued on April 26, 1947, restraining the defendants, John Popp, Stephen Halapin and The American Sons and Daughters of Carpatho-Russia, Inc., which corporation shall hereinafter be referred to as the congregation, from entering a certain house and land situated at 348 Mill Hill Avenue Bridgeport, which property shall hereinafter be referred to as the rectory, and from attempting to evict or eject the bishop or remove his personal property therefrom.
To this complaint of trespass, all defendants filed a general denial, together with special defenses alleging title and possession of the rectory in the congregation as well as use and occupation of the rectory by the bishop merely as a servant of the congregation through an employment contract hiring him as the congregation's pastor. *Page 155 
The congregation now seeks to dissolve the temporary injunction of April 26, 1947, and, predicated on a cross complain alleging title and possession of the rectory in itself, asks for an independent temporary injunction restraining the bishop from continuing his occupancy of the premises and from interfering with the congregation's use, possession and enjoyment of the property.
A proper perspective on the present litigation requires passing reference to McAuliffe v. Russian Greek Catholic Church,130 Conn. 521, wherein were determined disputes within the Greek Catholic Church in Bridgeport, and as a result of which legal title to church property, a rectory, a parochial cemetery and a parochial school was declared to be held for the uses of a Roman Catholic church of the Greek Ruthenian rite, that is, a Greek Catholic church united with Rome, rather than an independent autonomous Greek Catholic church. In consequence of that decision, the congregation in the pending matter, as the defeated defendant in McAuliffe v. Russian Greek CatholicChurch, supra, found itself stripped of all tangible temporal possessions, but quickly resolved that from the dead, cold ashes of its loss it would attempt to evolve a new and peaceful parochial life.
To this end, the congregation, numbering some 950 families and 4500 souls, acquired choice Bridgeport property upon which is located the controversial rectory and adjoining which has been constructed the representative and magnificent Carpatho-Russia Greek Catholic cathedral of St. John the Baptist. For its religious counsel and leadership, the congregation, at its annual meeting of December 10, 1944, turned to the plaintiff bishop, who was selected as pastor of the church for the ensuing year with compensation fixed at $175 per month, together with rent-free residence privileges in the rectory as well as the free supply of gas, electricity, heat and local telephone service. At the conclusion of that year's employment, the bishop, at the congregation's annual meeting of January 20, 1946, was again selected as pastor for the next ensuing year, such designation having been renewed under the identical financial terms, including, of course, rent-free residence in the parish rectory.
The better judicial authority holds unequivocally that the bishop, in entering and continuing his pastoral employment, acquired and maintained the status of servant of the congregation; that his contract of employment was one purely personal to himself; that his occupancy of the rectory was connected *Page 156 
with and in consideration of his services as pastor; that, as to the use and occupancy of the rectory, the conventional relationship of landlord and tenant never came into being; that where the occupation of a house by a servant is connected with the service, or is required by the employer for the necessary or better performance of the service, the occupation is as servant, not as tenant, and the possession is that of the master; and that the bishop's possession of the rectory was simply an incident to his appointment and to his service, the better to enable him to discharge the duties of his office. Chatard v. O'Donovan,80 Ind. 20; East Norway Lake Church v. Froislie, 37 Minn. 447. Thus it must be obvious that the natural an unstrained construction of the contract of employment between the congregation and the bishop calls for a conclusion that when the bishop's pastorate shall terminate, at his election or by operation of law or by act of the congregation, then his right to occupy the rectory shall be extinguished simultaneously.
During the closing months of 1946 and the early weeks of 1947, disharmony and disunity enveloped the relations between the congregation and its pastor, and affection that once possessed an unknown bottom was transformed into strong and unyielding scorn. That this unhappy condition could have arisen so swiftly seems incredible when it is recalled that for some thirty-six years the bishop, as pastor of the flock, ministered with unfailing faith and devotion, enjoying the trust and confidence and respect of his entire group, Congregational loyalty, however, a fickle and changeful commodity, wavered and faltered so that, at its annual meeting of January 19, 1947, the congregation, by a legal and convincing ballot, voted "that the services of the pastor be not renewed for the ensuing year."
It was further voted by the congregation that the pastoral service of the bishop would terminate at the end of sixty days — as of March 20, 1947. That date arrived with the bishop continuing his occupancy of the rectory, but because of the imminence of the great Christian feast, Easter, the congregation, mindful of the proprieties of the sacred season, took no steps to bring about the ejectment of the bishop, allowing his possession of the rectory to continue without interruption until April 15, 1947, when he was notified, in writing, to vacate immediately. His failure and refusal to follow the suggested course precipitated action on April 21, 1947, when efforts were made to exclude him from his quarters. *Page 157 
It is now contended that the congregation's failure to remove the bishop from the rectory on March 20, 1947, coupled with acquiescence in his remaining until April 21, 1947, created legal rights arising from his then status as a licensee or a trespasser. No right of possession to the rectory ever vested in the bishop nor was he ever in actual legal possession of the premises. His position from the very moment of his hiring in 1944 was that of the congregation's servant and his use and occupancy of the property was permissive as part of his compensation and as an incident of his service. Congregational consent to any other arrangement was never intended and there is nothing in the record to suggest an inference of such consent. Thus the bishop takes nothing from the circumstance that the congregation elected to delay his exclusion from the property for a matter of three or four weeks beyond the designated deadline for his removal.Carrier v. Carrier, 85 Conn. 203 207.
The legal relationship between the bishop and the congregation is further complicated by the claim that the bishop, in occupying the rectory, was and is enjoying its use not only as the congregation's pastor but also as bishop of the Carpatho-Russian Orthodox Greek Catholic Diocese of North and South America, to which province or dominion the defendant congregation is said to owe ecclesiastical allegiance and fealty. To be sure the situation presents the apparent anomaly of a cleric occupying a rectory in what may be described as a dual capacity, that is, as servant of his congregation, in his role as pastor, and as the ecclesiastical superior of his congregation, in his role as bishop.
In considering this phase of the litigation, I think it abundantly clear that the defendant congregation never intended to submit to the higher ecclesiastical authority implicit in diocesan control or in the rights or prerogatives attaching to the office of bishop. From the very outset of its organization, this congregation contrived to cloak itself with complete freedom and independence, undoubtedly to avoid a recurrence of the earlier legal conflict which resulted in the loss of its properties. The official certificate of corporate organization recites that the corporation shall forever remain generic in character, subject to no specific religious entity of any specific denomination, indicating further that there shall never by any higher church or ecclesiastical control over property or administrative social, spiritual, cultural or educational activities. Likewise, the approved receipt *Page 158 
given to building fund subscribers in return for contributions, asserts that no bishop, no diocese or no priest of any religious denomination, or its or their branches, shall ever have any right, title or interest in the church to be built from such funds or in any of its properties, or shall ever be able to impose upon it any canons, customs, uses, practices or any control whatsoever. Every material fact points to the defendant congregation as an independent autonomous body, free from higher ecclesiastical control and authority.
Therefore, the fact that the bishop was permitted to occupy the congregation's rectory not only as his pastoral home but also as an episcopal residence creates in him no independent or superior legal right flowing from his office of bishop. The use of the property as a diocesan headquarters was quite incidental and secondary; its primary purpose being that of a parish rectory for the convenience and accommodation and advantage of the parishioners.
Since it is my conclusion that the bishop has never had the right of possession to the rectory, nor has he ever been in the actual legal possession thereof, nor has his status ever been more than that of a servant of his congregation, it follows that the temporary injunction of April 26, 1947, should be and it is hereby dissolved.
Likewise the congregation is entitled to an independent injunction to restrain the bishop from further occupancy of the rectory and from further interference with the congregation's lawful use, possession and enjoyment of the premises. "Where a pastor, after having been legally removed from office by governing church authority, seeks thereafter ... to continue in possession of church property devoted to the use and benefit of its pastor, a court ... may grant an order the essential nature of which is to restrain, although the defendant in yielding obedience thereto may incidentally be compelled to perform an over act in relinquishing possession and control of church property."Sanders v. Edwards 199 Ga. 266. The congregation is without an adequate remedy at law since immediate occupancy of the rectory is essential to the orderly, peaceable and well regulated operation of parish affairs. A new pastor has come to minister to the spiritual needs of 4500 parishioners; he is without suitable or accessible living quarters; and he should be available to his church for the proper performance of religious duties. *Page 159 
"An injury is irreparable when there is no legal remedy furnishing full compensation or adequate redress because of the ineffectiveness of such legal remedy, or when, owing to the delay incident to the prosecution of an action at law to final judgment and obtaining execution thereon, such judgment and process would be fruitless of beneficial results." Gorham v. NewHaven, 82 Conn. 153, 157.
Therefore a temporary injunction may issue requiring the plaintiff to vacate, within ten days from date, the land and buildings used as a parish house and restraining him and his agents, servants and employees from thereafter entering upon said land and buildings and from occupying the same or from trespassing upon said land and buildings or from otherwise interfering with the lawful use, possession and enjoyment of said land and buildings by the defendant corporation.
 Counsel for the defendant corporation is directed to prepare and submit promptly an order of temporary injunction in accordance with the foregoing and an order for service thereof.